747 A.2d 241

**Frank Lewis El BEY**

v.

**MOORISH SCIENCE TEMPLE OF AMERICA, INC.**

**No. 6269, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

March 3, 2000.

---

Charles G. Byrd, Jr. (Alston & Byrd, on the brief), Baltimore, for appellant.

John F. McLemore (McLemore, Johnson, Oliver & Bryant, P.A., on the brief), Silver Spring, for appellee.

Argued before BYRNES, ADKINS and MARY BETH McCORMICK (Specially Assigned), JJ.

ADKINS, Judge.

In this case we examine the parameters of a court's authority to resolve a dispute regarding the internal operations of a religious organization. We must decide whether the Circuit Court for Prince George's County erred in issuing an injunction against Frank Lewis El Bey, appellant, based on a complaint by the Moorish Science Temple of America, Inc. (the "Corporation"), appellee, seeking to enjoin appellant from holding himself out as an officer, director, agent or trustee of the Corporation. For the reasons that follow, we see no error, and affirm the decision of the trial court.

## FACTS AND LEGAL PROCEEDINGS

Appellee is a religious corporation organized and incorporated in 1928 under the laws of the State of Illinois. Its founder, Noble Drew Ali, filed articles of incorporation with the appropriate department of the State of Illinois. In the articles, he designated certain named individuals as "sheiks," to serve in lieu of trustees. The Constitution and Bylaws, adopted in 1928, provided that the Grand Sheik and Chairman of the Corporation had the "power to make law and enforce laws with assistance of the Prophet[1] and Grand Body of the Moorish Science Temple of America."

In 1934, after the death of Drew Ali, the Corporation adopted rules and regulations for governance and succession of officers in the organization. These were embodied in a document titled "Rules and Regulations of the Moorish Science Temple of America and the Moorish Holy Temple of Science" as set forth by "The Grand Body at the Seventh Annual Convention held at ... Chicago, Illinois, from September 15th to the 20th, 1934" ("Regulations"). The Regulations designated fifteen persons as officers, including a "Supreme Grand Advisor and Moderator," "Grand Governors" of several

---

1. The term "prophet" apparently has been used since 1928 to refer to Noble Drew Ali.

temples located in several different states, a treasurer, secretary and others.

The Regulations provided that: (1) "All Offices shall be declared vacant during each Annual Convention, which shall be held from September 15[th] to the 20[th] (inclusive) each year;" (2) "no one shall serve in an office after an Annual Convention unless he or she has been duly elected or re-elected to such office," and (3) "no official is eligible to fill an office unless he has proper Credentials; same having been issued by the Supreme Grand Advisor." The Regulations also declared that "[t]he assemblage of the representatives of the various Temples through-out the United States; said assemblage being on the date set forth [herein] may be termed 'The Grand Body' or 'The Grand Major Temple.'" The Regulations further provided that "[t]he Supreme Grand Advisor and Moderator alone shall issue Charters, Ordination Papers and Credentials." The Corporation continued to operate and be governed by these Regulations from 1934 to the present.

On September 10, 1996, appellant sent a written memorandum ("Announcement") to "All Governors, Grand Sheiks and Head Official [sic] of All Temples of America" announcing, *inter alia,* that he had been

> appoint[ed] as Trustee of the Express Trust created by the Prophet Noble Drew Ali; through fulfillment of that appointment, I have been vested with all authority and power of The Moorish Science Temple of America ... Accordingly, my office as Chief Executive Officer of The Moorish Science Temple of America, Inc. is effective immediately.... I will appoint by January 8, 1997, an Executive Council (Rulers) of which I will act as Chairman.

In his written notification, appellant also stated that "a similar Memorandum will be prepared and circulated among all" members of the Corporation. He advised the recipients of the Announcement to "consult with your attorney concerning the issue of the trust ... or The Corporation's attorney, to get an informed, legal opinion and understanding of the trustor, trustee, and trust."

On January 24, 1997, the Corporation filed a complaint seeking *ex parte,* interlocutory and permanent injunctions against appellant. Specifically, the Corporation sought to enjoin appellant from referring to himself as an officer, director, agent or trustee of the Corporation. Appellee alleged that appellant was fraudulently collecting money in the name of the Corporation, disseminating false and misleading information about his status as a trustee of the Corporation, and attempting to recruit others from the church base with the intent to cause the Corporation embarrassment and to tarnish its reputation and good name.

The circuit court issued the *ex parte* injunction based on the complaint and supporting documents. The court also issued a show cause order and set a hearing date.

When appellant did not appear at the hearing on March 26, 1997, the court issued an interlocutory injunction that enjoined appellant "from referring to himself as an officer, director, agent or trustee for or of" the Corporation during the pendency of the case. Appellant's first pleading in the case was a motion to dissolve the interlocutory injunction filed on April 25, 1997. After a trial on the merits on January 6, 1999, the court granted a permanent injunction against appellant, "restraining and enjoining him from representing himself as an agent, officer and/or trustee for or of the Moorish Science Temple of America, Inc." This appeal was timely noted.

## DISCUSSION

Appellant asks us to decide: 1) whether the circuit court had authority to resolve the religious dispute presented in light of the First Amendment to the United States Constitution; 2) whether the requisite likelihood of damage to appellee in order to justify an injunction against appellant was demonstrated; and 3) whether the court, in ordering the injunction, failed to properly apply the term "trustee" in the sense the term was used by appellant.

**I.**

**The circuit court had authority to resolve this legal dispute involving a religious organization.**

■ Appellant first argues that the circuit court lacked authority to resolve the dispute presented because of its ecclesiastical nature. We disagree that the conflict is purely ecclesiastical and hold that the order issued by the circuit court addressed only the secular aspects of the dispute between the parties, which were resolved by neutral, secular principles.

**i.**

**General Principles**

■ It is well established that generally courts have no authority to resolve religious disputes. *See Mount Olive African Methodist Episcopal Church of Fruitland, Inc. v. Board of Incorporators of the African Methodist Episcopal Church Inc.,* 348 Md. 299, 309, 703 A.2d 194 (1997). " 'Such matters "must be left with the authorities of the church or denomination who have the power ... to consider and determine upon them." ' " *Id.* (quoting *Polen v. Cox,* 259 Md. 25, 31–32, 267 A.2d 201 (1970), in turn quoting *Shaeffer v. Klee,* 100 Md. 264, 271, 59 A. 850 (1905)). We recognize, however, that "there might be some circumstances in which marginal civil court review of ecclesiastical determinations would be appropriate." *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 447, 89 S.Ct. 601, 605, 21 L.Ed.2d 658 (1969); *Mount Olive,* 348 Md. at 310, 703 A.2d 194 (holding that although Maryland courts should not enter into a 'theological thicket,' "[t]his does not mean ... that the courts may not resolve any issue in which a church or denomination is a party.").

In avoiding the "religious thicket" we must be cautious not to deprive religious organizations of *all* recourse which is available to all others. This would leave religious organizations at the mercy of anyone who appropriated their property with an assertion of religious right to it. *See Maryland and Virginia Eldership of the Churches of God v. Church of God at*

*Sharpsburg, Inc.,* 249 Md. 650, 661, 241 A.2d 691 (1968) (*Eldership I* ).[2]

The Supreme Court has held that a court may resolve property disputes by applying secular principles of property, trust, and corporate law when the instruments upon which those principles operate are at hand. *See Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970). The Supreme Court has explained several advantages of this approach:

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of . . . law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglements in questions of religious doctrine, polity, and practice.

*Jones v. Wolf,* 443 U.S. 595, 603, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979). These advantages were deemed substantial enough in *Jones* to permit the state court to decide the property dispute by neutral principles even though the outcome might contravene the decision of the hierarchical church. *See id.* at 604–06, 99 S.Ct. at 3026–27.

In the instant case, the relief ordered by the circuit court required no inquiry into religious doctrine, and could be resolved by neutral secular principles because it addressed the protection of a property interest of appellee.

### ii.

### Threshold Requirement: Judicially–Protectable Interest

■ The threshold requirement for application of the neutral-principles doctrine is that there be a "judicially-protecta-

---

**2.** The Supreme Court vacated the judgment in *Maryland and Virginia Eldership,* and remanded the case to the Court of Appeals. On remand the Court affirmed its prior holding, 254 Md. 162, 254 A.2d 162 (1969), *aff'd,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970).

ble interest." *Ardito v. Board of Trustees, Our Lady of Fatima Chapel,* 281 N.J.Super. 459, 658 A.2d 327, 331 (1995)(quoting *Chavis v. Rowe,* 93 N.J. 103, 459 A.2d 674 (1983)). The property interest at issue here is appellee's interest in its name and the good will associated with it.

Although the record does not reflect whether appellee owned specific real or tangible personal property, a property interest entitled to protection is not limited to real or tangible personal property. The leading case of *American Gold Star Mothers, Inc., v. National Gold Star Mothers, Inc.,* 191 F.2d 488 (D.C.Cir.1951) explained that the property interest of a nonprofit corporation entitled to protection includes the corporation's interest in its good name:

> Source, reputation, and good will are as important to eleemosynary institutions as they are to business organizations. 'Anything which tends to divert membership or gifts of members from them injures them with respect to their financial condition in the same way that a business corporation is injured by diversion of trade or custom.' 'Distinct identity is just as important to such an organization, oftentimes, as it is to a commercial company. Its financial credit—its ability to raise funds, its general reputation, the reputation of those managing and supporting it, are all at stake if its name is used by some other organization and the two become confused in the minds of the public.'

*Id.* at 489 (citations omitted). *Accord, Pilgrim Holiness Church v. First Pilgrim Holiness Church,* 115 Ill.App.2d 448, 252 N.E.2d 1, 7 (1969) (the right to protection of the good will in one's name extends to nonprofit organizations); *see also Purcell v. Summers,* 126 F.2d 390, 394 (4th Cir.), *cert. denied,* 317 U.S. 640, 63 S.Ct. 32, 87 L.Ed. 516 (1942); *National Board of the Young Women's Christian Ass'n v. Young Women's Christian Ass'n of Charleston, S.C.,* 335 F.Supp. 615, 621 (D.S.C.1971); 37 A.L.R.3d 277, 27 A.L.R.2d 954.

In the present case, appellee has an interest in protecting its good name as a stable religious organization with an orderly mode of government and succession of leaders. Testi-

mony at the hearing revealed that appellee had maintained continuous corporate existence since 1928, and had followed specific procedures for election of officers since 1934. It operates more than 300 temples located in various cities in the United States. Mr. Robert Love El, the representative of the Corporation at the hearing, testified that he had been its chief executive officer for twenty-seven years.

### iii.

### Threatened Injury to Property Interest

Appellant's actions and threatened actions jeopardized the continuation of appellee's good name in several ways. He proclaimed himself to be the chief executive officer of the Corporation, when the Regulations and established custom since 1934 required that all officers be elected at the Corporation's annual convention. He announced that the Regulations, although adopted more than fifty years ago, were invalid because they deviated from the true intent of the original prophet, who died in 1929.

Appellant sent his Announcement to Corporation leaders throughout the country, and threatened to send it to all members, who, presumably, constitute the ongoing financial support for the Corporation. All of these actions had the potential for destroying the Corporation's name as a stable religious organization with an orderly government and succession process. Such reputation was significant to the Corporation's ability to retain its members, and raise money from its membership for its continued operations.

### iv.

### Application of Neutral Secular Principles

We held in *Seat Pleasant Baptist Church Bd. of Trustees v. Long,* 114 Md.App. 660, 676, 691 A.2d 721 (1997), that a court may, under the neutral-principles doctrine, interpret the by-laws and constitution of a church in determining whether an election of a board of trustees occurred. A similar judicial process is required in this case. The order issued by the

circuit court did not purport to resolve any dispute over religious doctrine. It simply restrained appellant from holding himself out as an officer, trustee, or agent of the Corporation. Corporate and contract law principles can be applied to determine whether appellant had been selected as a director or trustee of the Corporation.

Although appellant disputes the validity, on ecclesiastical grounds, of the 1934 Regulations, he does not dispute that these Regulations were, in fact, adopted by the members of the Corporation in 1934. Nor does he dispute that these Regulations were the method utilized by the members since 1934 as the means for electing the successor to the prophet and other officers. Specifically, appellant testified that the presidency of Love El "evolved out of a system that was created, adopted and imposed upon the Moorish Science Temple of America, Inc. in 1934." The basis of appellant's attack on the Regulations is best expressed by quoting his Memorandum filed in support of his Motion to Dissolve Injunction:

> [Love El] has no 'real authority.' The rules and regulations of 1934 do not supersede, add to, or alter the founder's structure or authority established in 1928.... The system adopted in 1934 to select R. Love El to that office was not prescribed by the founder ... nor was it arrived at from the original structure established by the founder.... R. Love El's office was born out of misunderstanding. (It was makeshift, despite existing for over 60 years; a system to make do until the truth regarding the founder's structure was revealed ...). That process has been maintained from 1934 until the present primarily by customs....

The validity of appellant's claim to the status of a corporate officer can be determined on secular grounds based on the historical adoption, consistent use, and actual text of the Regulations. The Regulations, in "Act I," provide that all "[o]ffices shall be declared vacant during each Annual convention," which was to be held between September 15 and 20 of each year. "Act 2" provides that officers must be "duly elected." The Grand Body, which includes "the assemblage of

the representatives of the various Temples throughout the United States", would elect the officers.

Appellant makes no claim that he was *elected* as an officer, trustee, or agent of appellee. Rather, he claims that his power as the chief executive officer is derived from an "express trust" created by the Corporation's founder, Drew Ali, who died in 1929, years before appellant was born.

The trial court asked appellant repeatedly for documentary evidence of this "express trust" or any tangible evidence that such trust had been created, but appellant was not able to produce any supporting documents. Nor did he explain how the "express trust" was communicated to him by Drew Ali. Nor did he present any witness other than himself to testify in support of the existence of an "express trust" giving him all secular power over the Corporation and its assets. When the court questioned him as to his standing and the basis of his position that he is a trustee, appellant answered "[b]ecause the trust that was created by the prophet in 1928 was reposed in me and I received the trust, deeds, and rudiments of title in 1978." [3]

---

**3.** The court asked appellant if he had the documentation to proffer to the court and he responded affirmatively. The following colloquy then occurred:

THE COURT: And they were presented to you when?
[APPELLANT]: In 1978.
THE COURT: By whom?
[APPELLANT]: By Moor.
THE COURT: By who?
[APPELLANT]: A Moor ... gave me the actual deed of conveyance that culminated my appointment as the trustee.
THE COURT: You were appointed trustee in 1978?
[APPELLANT]: No. I received the documents ... in 1978.
THE COURT: When were you appointed trustee?
[APPELLANT]: When the trust was—when I obtained the knowledge of the trust. . . .
THE COURT: When were you appointed and who appointed you?
. . .
[APPELLANT]: My appointment, Your Honor—as I said, my appointment was a legal appointment in 1928. . . .

&ast;&ast;&ast;&ast;&ast;&ast;

THE COURT: Who appointed you and by what authority were you appointed?

**556**

■ Because appellee is an Illinois corporation, issues involving its internal corporate affairs are governed by Illinois law. *See* W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5:03 at 561–62 (1988 Rev. Vol.). The Illinois Religious Corporation Act provides:

> The successor of the presiding officer of any ecclesiastical body . . . shall, by virtue of his office, be for the time being a trustee of such corporation in place of his predecessor, and when the office of any other trustee becomes vacant, his successor shall be appointed in the manner provided for in the original selection. The number, term of office, and the qualifications of the trustees of any such corporation, may be determined by the usages, customs, rules, regulations, articles of association, constitution, bylaws or canons of the ecclesiastical body. . . .

805 Ill. Comp. Stat. 110/46c (West 1999). Another section of the Illinois statute provides:

> All elections of trustees after the first, and elections to fill vacancies, may be called and conducted upon such notice and in such manner as may be provided by the rules, usages or by-laws of the congregation, church or society.

*Id.* at 110/39.

■ The Illinois statute provides the neutral principles upon which to base a decision in this case. Applying that statute, we see that appellant can readily be determined not to qualify as the chief executive officer of the Corporation because he was not selected by election, as called for in the Regulations and by undisputed custom since 1934. Further, appellant does not qualify as a trustee of the Corporation because both the Regulations and the historical customs of appellee dictate that sheiks, the Corporation's name for its

---

[APPELLANT]: I received my appointment directly from the prophet. . . .
THE COURT: So you received this appointment directly from the prophet . . . who was dead long before you were born? Is that what you're saying?
[APPELLANT]: That's what I'm saying, Your Honor. . . .

trustees, shall be elected at the annual convention of the Corporation by representatives of each temple. In the absence of any evidence that appellant was elected to the offices that he claims to hold, the trial court was justified in concluding, based on neutral secular principles, that he was not an officer, trustee, or agent of appellee.

## v.

### The Trial Court's Examination of Religious Documents

■ Appellant argues that the court improperly entered the "theological thicket" when it examined religious documents to determine whether the prophet Drew Ali had intended the creation of any trust in favor of appellant, and concluded that he had not. We do not agree. After examining the record, we conclude that, while the trial court examined and evaluated various documents that were the writings of the founder and prophet, Drew Ali, it did so only for a secular purpose: to determine whether Drew Ali had expressed in those documents the intent to create a trust in appellant, as that term is used in a secular context.

Appellant introduced certain documents for the court to consider as evidence of a trust in appellee. The first item was the articles of incorporation for the Corporation. The court observed that the articles indicated the same information that Mr. Love El had testified to—that there were no trustees and that the founder of the Temple did not name any trustees—expressly contradicting what appellant was arguing. The court characterized the founder's action as taking "the form of this deed and expressly lin[ing] out [the word] trustee and put[ting] in its place the word 'sheik.'" The court concluded that this document "expressly eliminates trustee[s]."

The second document appellant offered to prove that there is a trust and he is the trustee was the *Holy Koran*. The court read the specific sections designated by appellant into the record and stated: "There isn't a word in those 10 verses that says anything or indicates anything about a trustee." Appellant next offered a religious pamphlet and directed the

court to read a specific section, which the court did, on the record. Again the court pointed out that there was no evidence of any sort of a trust in the document. Appellant then introduced several other pieces of literature, all of which pertinent portions the court read into the record.

In its oral opinion, the court first defined an express trust, "because there seems to be a misunderstanding as to exactly what an express trust is." The court then found that "there is absolutely no indication that the founder of this movement ever intended a trust of anything. To me, his writings are clear, lucid, plain to the understanding for anyone who wants to read them."

Both the court's observations as it examined the documents and the narrow order that it signed, convince us that the trial court, in its analysis of the religious documents, was looking to see whether Drew Ali had created a secular property interest in appellant by the use of the term "trust" or "trustee." The order was narrowly drafted, and contained no directive regarding ecclesiastical doctrine. It simply determined that appellant was not a trustee, director, or agent of the Corporation in the secular context of the law governing the organization. There is no indication in the record that the trial court examined these documents in order to make any ecclesiastical interpretation, or intended any ecclesiastical interpretation or directive by its order.

## II.

### The circuit court did not abuse its discretion in granting injunctive relief to the Corporation.

Appellant argues that the trial court abused its discretion in entering an injunction because no evidence was presented that his actions caused any damage or injury to the Corporation. Appellee counters this, and contends that the court did not abuse its discretion in determining that appellant was fraudulently holding himself out as an officer or "trustee" of the Corporation and that this caused irreparable harm to the good will and good name of the Corporation.

 The granting or denying of a request for injunctive relief rests within the sound discretion of the trial court. *See Lerner v. Lerner,* 306 Md. 771, 776, 511 A.2d 501 (1986). Injunctive relief will not be granted unless there is a finding of irreparable harm or threat thereof. *See Campbell v. Mayor & Aldermen of City of Annapolis,* 44 Md.App. 525, 536, 409 A.2d 1111 (1980), *rev'd on other grounds,* 289 Md. 300, 424 A.2d 738 (1981). "[I]rreparable injury is suffered whenever monetary damages are difficult to ascertain or are otherwise inadequate." *Maryland—Nat'l Capital Park and Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 616, 386 A.2d 1216 (1978). Furthermore, courts have the power to grant injunctive relief to prevent or prohibit a threat of harm that has not yet occurred. *See Leatherbury v. Peters,* 24 Md.App. 410, 412, 332 A.2d 41, *aff'd,* 276 Md. 367, 347 A.2d 826 (1975).

 Issuance of an injunction is reviewed by this Court under the abuse of discretion standard. *See State Dep't of Health & Mental Hygiene v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51 (1977); *Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc.,* 117 Md.App. 290, 305, 699 A.2d 1209, *cert. denied,* 347 Md. 681, 702 A.2d 290 (1997). This standard applies to the trial court's determinations of legal questions or conclusions of law based upon its findings of fact. Those rulings will not be disturbed absent a clear showing of abuse of discretion. *See Maryland Comm'n on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 521, 678 A.2d 55 (1996).

 As indicated previously, when questioned directly by the court as to his standing and the basis of his position that he was named as trustee by an express trust created by Drew Ali, appellant was unable to identify any writing to support this claim, or even explain how, in the absence of a writing, the trust was communicated to him over sixty years after the founder's death. Nor did any other witness testify in support of the existence of such trust.

Mr. Love El testified that he held the title of the "Grand Sheik" of the Corporation, and had been in this position for the last twenty-seven years. He said that the prophet, Drew Ali, incorporated the Corporation in Illinois and appointed officials whom he designated as "sheiks and sheikess[es]" "instead of calling them 'trustees.'" He further testified that the title "trustee" was not used, had never been used, and in fact there was absolutely no provision for a "trustee" in the organization. Mr. Love El explained that he is the fourth successor of the head of the organization, and that his position is an elected position. Elections are held annually. He testified that appellant had never held any office in the organization. He testified that appellant's actions continue to damage the Corporation's reputation. He further stated that the "prophet didn't transfer any land by deed ... and that [any] property was to be in the name of [the Corporation] and no individual's name."

We addressed in section I the nature of the property interest in its good name and reputation that appellee sought to protect by requesting an injunction in this case. The principles mentioned there regarding the value to a nonprofit corporation of its name and good will also refute appellant's argument that there was no sufficient injury or threatened injury to appellee to justify the injunction.

Appellant argues that appellee never proved that appellant had actually solicited funds in the name of the Corporation. While we agree that there was no proof of actual solicitation, there was proof that he threatened to do so. In his Announcement, appellant specifically requested of the recipients: " I pray that you join in and support our actions morally, [and] **financially** . . . ." By stating that he intended to send a similar announcement to the members of the Corporation, he thus threatened to solicit funds from the Corporation's membership. This threat by appellant to solicit funds in the name of the Corporation was in itself a sufficient basis to justify the injunction entered against him.

For these reasons, we conclude that the court acted within its discretion in determining that the Corporation has suffered and will continue to suffer irreparable harm from appellant's false representation of himself as the chief executive officer of the Corporation.

## III.

### The circuit court did not err in refusing to consider the religious meaning of "trustee" when determining the merits of appellant's case.

Lastly, appellant argues that the circuit court erred in refusing to consider the religious meaning of the term "trustee" that he relied upon in asserting his right to serve as the chief executive and presiding officer of appellee. Appellant, by this argument, complains about the court failing to do precisely what he simultaneously asserts that court cannot do. As previously discussed in section I, *supra*, "Maryland courts . . . have no authority to resolve religious disputes." *Mount Olive*, 348 Md. at 309, 703 A.2d 194. The trial judge neither was legally permitted nor required to review the documents in evidence to discern the existence of a religious meaning for the term "trustee." It did not do so in its analysis or in its order. Accordingly, the circuit court acted properly in refraining from any ruling on any religious doctrine which may have been implicated under these circumstances.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**