765 A.2d 132

**Frank Lewis EL BEY,**

v.

**MOORISH SCIENCE TEMPLE OF AMERICA, INC.**

**No. 37, Sept. Term, 2000.**

Court of Appeals of Maryland.

Jan. 9, 2001.

340

Charles Grant Byrd, Jr. (Alston & Byrd, on brief), Baltimore, for petitioner.

John F. McLemore (Law Offices of John F. McLemore, on brief), Silver Spring, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL, and HARRELL, JJ.

HARRELL, Judge.

On 27 March 1997, the Circuit Court for Prince George's County issued an interlocutory injunction restraining Frank Lewis El Bey (Petitioner) from referring to himself as an officer, director, agent, or trustee for or of the Moorish Science Temple of America, Inc. (Temple or Respondent), a religious corporation of the State of Illinois. Following a trial held on 17 December 1998, the injunction was made permanent by an order dated 6 January 1999. Petitioner appealed to the Court of Special Appeals asserting that the Circuit Court did not have the authority to resolve a religious dispute, that damages sufficient to merit an injunction were not shown,

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

and that the Court failed to apply the appropriate definition of the term "trustee." The intermediate appellate court, in a reported opinion, affirmed the Circuit Court, holding that the dispute was resolved properly by the application of neutral, secular principles, that Respondent had suffered and would continue to suffer irreparable harm from Petitioner's misrepresentations unless such conduct were enjoined, and that the term "trustee" was not a term of legal significance within the contemplation of the Temple's corporate documents or structure. *El Bey v. Moorish Science Temple of America, Inc.*, 130 Md.App. 543, 561, 747 A.2d 241, 251 (2000).

We granted Petitioner's Petition for Writ of Certiorari,[1] which posed the following three questions:

1. Whether the Circuit Court and Court of Special Appeals erred in holding that the Courts have subject matter jurisdiction to determine the governance of a religious organization by the application of secular corporate principles notwithstanding the fact that the parties have agreed that the religious dispute cannot be resolved by the application of secular corporate principles; but instead, by the internal religious documents of the religious organization?

2. Whether the Circuit Court and the Court of Special Appeals erred in holding that a religious organization has a judicially-protectible property interest in its name?

3. Whether the Circuit Court and the Court of Special Appeals erred in holding that a person can be enjoined from referring to one's self as the leader of a religious organization and his stated intention to continue to do so in the future, notwithstanding the fact that the undisputed facts show that the religious organization has not been harmed in any respect whatsoever as a result thereof?

---

[1]. *Bey v. Moorish Temple,* 359 Md. 333, 753 A.2d 1031 (2000).

We conclude that a fundamental flaw in the underpinnings of the Circuit Court's issuance of the injunction is the absence in the record of evidence of irreparable harm or damage meriting the relief granted. Accordingly, we reverse the Court of Special Appeals and remand the case to it with directions to vacate the injunction.

## I.

### A. Background and Organization of the Moorish Science Temple of America, Inc.

Noble Drew Ali founded the Moorish Holy Temple of Science in 1913 in Newark, New Jersey, as a vehicle to advance the tenets of the Islamic faith, as he viewed them to be, in the United States. He subsequently incorporated the Temple in 1926 under Illinois law as a civic corporation. In 1928, Noble Drew Ali changed the name of the corporation to the Moorish Science Temple of America, Inc., and changed the purpose of the organization from civic to religious. During his leadership of the Temple, Noble Drew Ali served as the Moderator (the head of the Temple) and also was referred to as the Prophet, a title of religious, but not legal, significance within the corporation. According to the Temple's articles of incorporation, as well as its constitution and bylaws adopted in 1928, the elected officers who served under the Moderator included the Branch Sheik, the Grand Sheik, and other chairpersons. The Temple's outposts grew rapidly under Noble Drew Ali's leadership, with temples established in many states.

Noble Drew Ali died in 1929. During the Temple's seventh annual national convention in September 1934, it adopted rules and regulations regarding the governance and succession of officers of the Temple. Under these rules, the Moderator position became an elected one known as the Supreme Grand Advisor and Moderator,[2] which continues to be the title used by successive national corporate leaders, including the current

---

2. It appears from the record that the title of Supreme Grand Advisor and Moderator is sometimes referred to as "President."

one, Robert Love El (Love El), a resident of Prince George's County, Maryland. Other elected officers are now known as Grand Governors or Governesses, Grand National and Assistant Grand National Secretary, Grand National and Assistant Grand National Treasurer, and Secretary and Treasurer of the related Moorish Manufacturing Company.

## B. *The Dispute*

On 10 September 1996, Petitioner provided to "all Governors, Grand Sheiks and Head Official [sic] of All Temples of America" affiliated with Respondent a memorandum announcing that he was

> appoint[ed] as Trustee of the Express Trust created by the Prophet Noble Drew Ali; through fulfillment of that appointment, I have been vested with all authority and power of The Moorish Science Temple of America.... Accordingly, my office as Chief Executive Officer of the [Temple] is effective immediately.... I will appoint by January 8, 1997, an Executive Council (Rulers) of which I will act as Chairman.

Petitioner also stated that "a similar Memorandum will be prepared and circulated among all" members of the Temple. He concluded his announcement by advising the Temple leadership to seek out the aid of an attorney regarding Petitioner's legal rights as the Temple's trustee.[3]

---

**3.** During the 17 December 1998 trial, discussed *infra*, the Circuit Court asked Petitioner whether he could document his appointment as the trustee of the Temple. The following testimony ensued:

> THE COURT: And [the trust documents] were presented to you when?
> [PETITIONER]: In 1978.
> THE COURT: By whom?
> [PETITIONER]: By Moor.
> THE COURT: By who?
> [PETITIONER]: A Moor. A Moor named Lars Rossi (phonetic) gave me the actual deed of conveyance that culminated my appointment as the trustee.
> THE COURT: You were appointed trustee in 1978?

On 22 January 1997, Respondent[4] petitioned the Circuit Court for Prince George's County to issue *ex parte*, interlocutory, and permanent injunctive relief against Petitioner to prohibit him from referring to himself as an officer, director, agent or trustee of the Temple. Respondent, in its complaint, alleged that Petitioner fraudulently was collecting money in the Temple's name, disseminating false and misleading information about his status as a trustee of the corporation, and attempting to recruit Temple members; this conduct, it argued, would embarrass and tarnish Respondent's reputation and good name.

On 24 January 1997, the Circuit Court ordered Petitioner, a resident of the District of Columbia, to show cause at a hearing to be held on 7 March 1997 why a temporary restraining order should not issue as requested. Petitioner did not attend the hearing.[5] The court ordered on 26 March 1997 that

[PETITIONER]: No, I received the documents [the Holy Koran, portions of which the Petitioner later had read into evidence], Your Honor, in 1978.
THE COURT: When were you appointed trustee?
[PETITIONER]: When the trust was—when I obtained knowledge of the trust; Your Honor.
THE COURT: When were you appointed and who appointed you?
[PETITIONER]: In 1978 I received—
THE COURT: When were you appointed—well, first of all, who appointed you a trustee and when were you appointed?
[PETITIONER]: My appointment, Your Honor—as I said, my appointment was a legal appointment in 1928 under Illinois law....
 * * *
[PETITIONER]: I received my appointment directly from the prophet, Noble Dru Ali [sic], according to the requirements of Illinois in the appointment of a trustee to represent an expressed trust estate.
THE COURT: So you received this appointment directly from the prophet—
[PETITIONER]: Noble Dru Ali [sic].
THE COURT:—who was dead long before you were born? Is that what you are saying?
[PETITIONER]: That's what I am saying, Your Honor....
In later testimony, Petitioner refined his testimony regarding his appointment, acknowledging that "[n]o, [it's] not a legal appointment, and so forth, but it is a proper appointment."

4. Respondent asserted it was registered to do business in Maryland.

5. In his 25 April 1997 Motion to Dissolve the interlocutory injunction, Petitioner contended that "he did not receive a copy of the complaint,

Respondent be granted the interlocutory injunction restraining Petitioner from referring to himself as an officer, director, agent or trustee of the Temple. In response to this order, Petitioner, after it was served upon him, filed a motion on 25 April 1997 to dissolve the interlocutory injunction and requested a hearing. On 27 June 1997, he filed a counterclaim in which he sought to "take possession of all [Temple] trust property and assets." In an amended counterclaim filed on 4 August 1997, Petitioner also asked the court to grant an injunction restraining the Temple from relying on the 1934 bylaws and Love El from representing himself as the President of the Temple.

The parties tried the matter before the Circuit Court on 17 December 1998. In support of its request for permanent injunctive relief, Respondent stressed several points advanced previously in support of the temporary injunction. First, it argued that Petitioner had no authority over or within the organization in which he was neither a member nor an elected officer. Specifically, Love El testified that only the Supreme Grand Advisor and Moderator is authorized under its charter

---

notice, or anything related to the complaint" until 1 April 1997, when he received the Circuit Court's Order granting the interlocutory injunction. Maryland Rule 2–121 proscribes the manner in which *in personam* Service of Process must be made:

> (a) *Generally.*—Service of process may be made ... (3) by mailing to the person to be served a copy of the summons, complaint, and all other papers filed with it by certified mail.... Service outside of the State may also be made in the manner prescribed by the court or prescribed by the foreign jurisdiction if reasonably calculated to give actual notice.

Because Petitioner was a domiciliary of Washington, D.C., Md. Rule 2–121 permitted Respondent to serve Petitioner in accordance with the D.C. Ct.App. Rules. *See* D.C. Ct.App. Rule 25(c) (2000) ("Service may be personal or by mail."); D.C. Ct.App. Rule 25(d) (2000) ("Papers presented for filing shall contain either an acknowledgment of service by the person served or ... proof of service in the form of a certificate of counsel....").

According to the certificate of service attached to Respondent's Complaint and Motion for Ex Parte, Interlocutory, and Permanent Injunctive Relief, Respondent served Petitioner at two addresses via first class mail, postage prepaid. The certificate was not dated. Petitioner does not raise as an issue here improper service of process.

and bylaws to appoint a sheik, and that neither he nor any prior Supreme Grand Advisor had appointed Petitioner to that or any position within the Temple. Second, Love El testified the Temple does not recognize or utilize the title of trustee, observing that Noble Drew Ali "appointed officials.... Instead of calling them 'trustees,' he called them sheiks and sheikess [sic]." Third, Respondent concluded that Petitioner's conduct would hurt both the Temple's reputation and its purse strings. The Temple, through Love El and counsel, acknowledged, however, that its officers had not witnessed Petitioner soliciting members and that it was unable to provide any evidence that Petitioner had collected any monies under the guise of being a trustee of the Temple.

Defending his claim of control over the Temple, Petitioner countered that Noble Drew Ali created in him an express trust for the Temple and its holdings, and that this trust dated back to the 1928 incorporation of the Temple.[6] Petitioner explained that he became aware of his appointment in 1978, when a Moor gave him a deed of conveyance to the Temple, and that he accepted this appointment in 1981.[7] To support this contention, Petitioner asked the court to read into the record several documents that he claimed evidenced this express trust, including portions of the Temple's Holy Koran, which he claimed traced the title of various lands, including

---

**6.** In response to one of the Circuit Court's requests for documentation of the trust which Petitioner asserted he was given, Petitioner replied:

[PETITIONER]: Your Honor, what we're coming up with here is an express trust that was created by Noble Dru Ali [sic] in 1928 according to Illinois law. That's all I could come up. I'm here as a trustee. I come to present the evidence [the Temple's Holy Koran and the Temple's Articles of Incorporation] before the court to establish that a trust was created by Noble Dru Ali [sic] in 1928.

Upon the request of Petitioner, the court then read into evidence portions of the Temple's Articles of Incorporation and passages from the Temple's Holy Koran. According to Petitioner, these documents were evidence that "The trustor is Noble Dru Ali [sic]. I am the trustee." *See also* note 3, *supra.* Because Petitioner was not born until much later, he obviously was not identified by name (or otherwise) in these 1928 documents.

**7.** *See* note 3, *supra.*

the entire United States, from ancient peoples to the Moorish Americans of today. The "title" traced in the Koran, he argued, is the legal instrument which made him the rightful trustee of the Temple. Petitioner then argued that Love El's presidency and the offices held by other Temple members are invalid because they were elected by the Grand Body, but not appointed by the Prophet.

In response to the Temple's claims that he was conducting himself in a fraudulent manner, Petitioner responded that he could not have committed fraud or usurped Love El's presidency since Love El was not the authorized leader of the Temple, i.e., not appointed by the Prophet or Petitioner. He also argued that he had not fraudulently recruited members or collected a "substantial" sum of money. Rather, Petitioner claimed that, as the appointed trustee of the Temple, he had the right to "take possession of all trust property and assets into his immediate physical custody and possession."

### C. *Judgments of Circuit Court and Court of Special Appeals*

After considering the evidence, such as it was, and the parties' arguments and counter-arguments, the Circuit Court granted the Temple equitable relief and ordered a permanent injunction against Petitioner on 6 January 1998.[8] Although Petitioner had insisted repeatedly that he had been named the trustee of the Temple, the court found no evidence of any document providing for an express trust:

First of all, the Court would like to define "express trust," because there seems to be a misunderstanding as to exactly what an express trust is.

Since we are talking initially of a trustee, which [Respondent] says that it is a term that is foreign to the Moorish Science Temple of America, a trustee would have to be duly appointed or designated, and that the term includes a

---

**8.** The record reflects that the trial judge indicated on 17 December 1998 that he would mature the 26 March 1997 interlocutory injunction into a permanent injunction.

person with whom or in whose name a contract is made for the benefit of another.

... but the bottom line is there is absolutely no indication that the founder of this movement ever intended a trust of anything.

The judge determined that not only was the word "trustee" not used in any of the Temple's corporate documents received in evidence, but that "whoever drew [the Temple's articles of incorporation] up expressly eliminated [crossed-out] the word 'trustee' [in the form document] and replaced it [in handwriting] with [the word] 'sheik.'" Having found no evidence of an express trust to support Petitioner's claims to a secular leadership position or the property of the Temple, the court ordered the permanent injunction restraining Petitioner from referring to himself as an officer, director, agent, or trustee of the Temple.[9] Petitioner filed a direct appeal with the Court of Special Appeals on 22 December 1998. He ultimately asserted three grounds for reversal: (1) the Circuit Court lacked the authority to resolve the religious dispute presented by the case, in light of the First Amendment of the United States Constitution; (2) the requisite likelihood of irreparable damage to Respondent to justify an injunction was not demon-

---

9. Following a full and thorough review of the record and the docket entries, we note that, while the trial judge's 6 January 1999 order granted Respondent's injunction, the order did not address explicitly Petitioner's counterclaim requesting an injunction to restrain the Temple from using the 1934 bylaws and Love El from representing himself as the Temple's President. Despite this lacuna in the order, one could infer the trial judge's probable intent to deny Petitioner's claims because no other resolution of those claims could coexist logically with the relief granted. We need not determine whether this appeal is premature, however, because Petitioner's appeal is authorized by Md. Code (1957, 1998 Repl.Vol., 2000 Repl.Vol.), § 12–303(3)(i), Courts and Judicial Proceedings Article, which states:

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

...

(3) An order:

(i) Granting or dissolving an injunction, but if the appeal is from an order granting an injunction, only if the appellant has first filed his answer in the cause.

strated; and (3) the court, in ordering the injunction, failed to apply properly the term "trustee," at least in the sense that term was understood by Petitioner. On 3 March 2000, the intermediate appellate court affirmed the Circuit Court's judgment, holding that the Circuit Court properly resolved the dispute by neutral, secular principles, that "trustee" was not a term used by the Temple, and that the Temple had suffered and would continue to suffer irreparable harm from Petitioner's misrepresentations. *El Bey v. Moorish Science Temple of America, Inc.*, 130 Md.App. 543, 561, 747 A.2d 241, 251 (2000).

We granted certiorari on 23 June 2000. *Bey v. Moorish Temple*, 359 Md. 333, 753 A.2d 1031 (2000). Because we shall decide this case based on a point embedded in Petitioner's third question, we shall not answer his other queries.

## II.

### *The Circuit Court possessed the authority to consider injunctive relief in a legal dispute involving a religious organization.*

Before we consider whether the lower courts properly concluded that Respondent satisfied the requirements for the issuance of permanent injunctive relief in this case, it is necessary first to address Petitioner's concern that the trial court did not possess subject matter jurisdiction to hear this case. The parties agree that "Maryland courts, like courts generally in this country, have no authority to resolve religious disputes." *Mt. Olive African Methodist Episcopal Church of Fruitland, Inc. v. Board of Incorporators*, 348 Md. 299, 309, 703 A.2d 194, 199 (1997) (citing *Polen v. Cox*, 259 Md. 25, 31–32, 267 A.2d 201, 204–05 (1970)). Maryland courts have a legitimate interest, however, in resolving secular disputes, including those involving property interests or those requiring an interpretation of corporate charters or bylaws, through the application of neutral principles of law. *See, e.g., Mt. Olive*, 348 Md. at 310, 703 A.2d at 199; *American Union of Baptists, Inc. v. Trustees of the Particular Primitive Baptist Church*, 335 Md. 564, 644 A.2d 1063 (1994).

The pith of Petitioner's argument in this regard is that it was improper for the trial court to settle this ecclesiastical dispute because it does not concern real or personal church property, but rather the rightful leadership of the Temple. In numerous pleadings and papers filed in the Circuit Court, however, Petitioner repeatedly asserted that all "trust" property, assets, and records should be placed in his immediate physical possession.[10] To this, we remind Petitioner that " '[w]hen rights of property are involved ... the courts, of necessity, must proceed to consider and adjudicate those rights not only to solve the particular case and the rights of the litigants before them, but also to preserve definiteness and order in the holding of property by religious corporations.' " *Mt. Olive*, 348 Md. at 310, 703 A.2d at 199. We therefore conclude it incongruous for Petitioner to argue that the dispute does not concern real or personal Temple property when he put the ownership or right to possession of such property in issue.[11]

Petitioner also asserts that the Court of Special Appeals erred in resting its resolution of his subject matter jurisdictional challenge on the Temple's alleged proprietary "interest in protecting its good name as a stable religious organization with an orderly mode of government and succession of leaders." Because the trial court's jurisdiction over this dispute

---

10. In his 5 May 1997 "amended and supplemented answer" to his motion to dissolve the interlocutory injunction entered against him, Petitioner asked the court to "[o]rder Love–El to immediately turn over all records and assets belonging to said corporation to [Petitioner]." Moreover, his 27 June 1997 counterclaim and his 9 July 1997 amended counterclaim request, respectively, that he "take possession of all trust property and assets into his immediate physical custody and possession" and that the Circuit Court establish a trust account for "all proceeds from trust property are deposited and maintained until awarded to [Petitioner], or ... [taken] into his possession and control...."

11. Although the intermediate appellate court concluded that the record did not "reflect whether [the Temple] owned specific real or tangible personal property," it also stated that the Temple operated more than 300 temples around the country. We conclude from Petitioner's assertions in the Circuit Court record that he sought control of the property, assets, and records deriving from these temples.

stemmed from other proprietary interests, as we noted *supra,* we find it unnecessary to reach this issue.

## III.

### A. *Standard of Review*

■ When reviewing a judgment arising from a bench trial, we must "review the case on both the law and the evidence," but we must "not set aside the judgment of the trial court on the evidence unless clearly erroneous," for we must "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Maryland Rule 8–131(c) (2000 Repl.Vol.). Additionally, we must consider the evidence in the light most favorable to the prevailing party, deciding not whether the trial judge's conclusions were correct, but whether they were supported by a preponderance of the evidence. *See Colandrea v. Wilde Lake Community Ass'n, Inc.,* 361 Md. 371, 394, 761 A.2d 899, 911 (2000) (citing *Geo. Bert. Cropper, Inc. v. Wisterco,* 284 Md. 601, 620, 399 A.2d 585, 595 (1979); *State Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 305, 236 A.2d 282, 289 (1967)).

■■ An injunction is " 'a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience.' " *Colandrea,* 361 Md. at 394, 761 A.2d at 911 (quoting *Maryland Comm'n on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 515, 678 A.2d 55, 66 (1996)). Thus, injunctive relief is " 'a preventative and protective remedy, *aimed at future acts,* and is not intended to redress past wrongs.' " *Id.* (quoting *Carroll County Ethics Comm'n v. Lennon,* 119 Md.App. 49, 58, 703 A.2d 1338, 1342–43 (1998)). Alternatively, the Court of Special Appeals, in *Coster v. Dep't of Personnel,* 36 Md.App. 523, 373 A.2d 1287 (1977), adopted the following overview of the general law of injunction:

A court of equity reserves its injunctive process for the protection of property or other rights against actual or threatened injuries of a substantial character which cannot

be adequately remedied in a court of law. That is to say, the jurisdiction or power to grant injunctive relief should be exercised only when intervention is essential to effectually protect property or other rights, of which equity will take cognizance, against irreparable injuries. The very function of an injunction is to furnish preventative relief against irreparable mischief or injury, and the remedy will not be awarded where it appears to the satisfaction of the court that the injury complained of is not of such character. Suitors may not resort to a court of equity to restrain acts, actual or threatened, merely because they are illegal or transcend constitutional powers, unless it is apparent that irremediable injury will result. The mere assertion that apprehended acts will inflict irreparable injury is not enough. The complaining party must allege and prove facts from which the court can reasonably infer that such would be the result.

*Coster*, 36 Md.App. at 525–26, 373 A.2d at 1289–90 (quoting 42 Am.Jur.2d, *Injunctions*, § 48).

▮▮▮ In *Colandrea*, we most recently explained the differences between an interlocutory injunction and a permanent injunction:

A permanent injunction is, as its names indicates, "an injunction final or permanent in its nature granted after a determination of the merits of the action." Md. Rule BB70d. But a permanent injunction is not "permanent" in the sense that it must invariably last indefinitely. Rather, it "is one granted by the judgment which finally disposes of the injunction suit." The difference between an interlocutory injunction and a permanent injunction turns on "whether there has been a determination on the merits of the claim. If that determination has been made, then the injunction may be final; if not, it is interlocutory."

361 Md. at 395, 761 A.2d at 911 (internal citations omitted). We review the exercise of the trial court's discretion to grant or deny a request for injunctive relief under an "abuse of discretion" standard (*see Colandrea*, 361 Md. at 394, 761 A.2d

at 911 (citing *State Dep't of Health & Mental Hygiene v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51, 55 (1977))); however, we give no such deference when we find "an obvious error in the application of the principles of equity." *Western Md. Dairy v. Chenowith,* 180 Md. 236, 244, 23 A.2d 660, 665 (1942).

### B. *The Circuit Court erred in granting the permanent injunction.*

A fundamental question presented is whether Respondent produced evidence that Petitioner's conduct caused, or was likely to cause, it irreparable harm, the type of harm necessary to justify the court's issuance of injunctive relief. For the following reasons, we hold, on this record and viewing the evidence in a light most favorable to Respondent, that this threshold was not crossed, and, therefore, we reverse the judgment of the Court of Special Appeals and remand with directions that it vacate the judgment of the Circuit Court.

### 1.

 Injunctive relief normally will not be granted unless the petitioner demonstrates that it will sustain substantial and irreparable injury as a result of the alleged wrongful conduct. *Maryland–Nat'l Capital Park and Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 615, 386 A.2d 1216, 1234 (1978) (citations omitted); *Fort v. Groves,* 29 Md. 188, 193–94 (1868). Such injury, however, need not "be beyond all possibility of compensation in damages, nor need it be very great." *Maryland–Nat'l,* 282 Md. at 615, 386 A.2d at 1234 (quoting *Hart v. Wagner,* 184 Md. 40, 47–48, 40 A.2d 47, 51 (1944); *Smith v. Shiebeck,* 180 Md. 412, 422, 24 A.2d 795, 801 (1942)). Rather, "irreparable injury is suffered whenever monetary damages are difficult to ascertain or are otherwise inadequate." *Maryland–Nat'l,* 282 Md. at 615, 386 A.2d at 1234 (quoting *Glasco v. Hills,* 558 F.2d 179, 181 (3d Cir.1977)); *see also Dudley v. Hurst,* 67 Md. 44, 52, 8 A. 901, 904 (1887) ("An injury may be said to be irreparable when it cannot be measured by any known pecuniary standard."). The *Coster*

court enunciated the background principles regarding the nature of irreparable injury in a similar manner:

> As ordinarily understood, an injury is irreparable, within the law of injunctions, where it is of such a character that a fair and reasonable redress may not be had in a court of law, so that to refuse the injunction would be a denial of justice—in other words, where, from the nature of the act, or from the circumstances surrounding the person injured, or from the financial condition of the person committing it, it cannot be readily, adequately, and completely compensated for with money.

*Coster*, 36 Md.App. at 526, 373 A.2d at 1290 (quoting 42 Am.Jur.2d, *Injunctions*, § 49). Moreover, mere allegations or arguments by a petitioner that it will suffer irreparable damage are not sufficient foundation upon which to base injunctive relief; facts must be adduced to prove that a petitioner's apprehensions are well-founded. *Shiebeck*, 180 Md. at 421, 24 A.2d at 801 (1942) (citations omitted); *Mayor and Council of Salisbury v. Camden Sewer Co.*, 135 Md. 563, 573, 109 A. 333, 336 (1920) (citations omitted).

## 2.

At trial in the present case, Love El, on behalf of Respondent, testified that while Petitioner was holding himself out as a trustee of the Temple, Petitioner was not soliciting any monies under the guise of that alleged trusteeship. Moreover, when asked whether Petitioner's conduct had caused any dissension within the Temple, Love El responded "[n]one . . . . our organization is a national organization, with over 360 some temples around the country. This man is not even known by most of the people that's [sic] in our organization." Rather than demonstrating irreparable harm, such evidence supports the conclusion that Petitioner's conduct did not predict future irreparable harm.

According to Love El's testimony, Respondent's greatest concern regarding Petitioner was that his conduct violated its religious code, and that the Temple requested injunctive relief because addressing Petitioner's conduct was "costing [the

Temple] time and money." Love–El's assertions invoked ecclesiastical principles which the lower courts chose properly not to entertain, for "the courts, wisely we think, will not enter a 'theological thicket.'" *See Mt. Olive,* 348 Md. at 309, 703 A.2d at 199 (quoting *Maryland Virginia Eldership of Churches of God v. Church of God at Sharpsburg,* 249 Md. 650, 660, 241 A.2d 691, 697 (1968)). We conclude, therefore, that there is no evidence in this record to substantiate the Circuit Court's implicit (and required) finding of irreparable harm.

### IV.

Petitioner also asks us to determine whether the Circuit Court improperly considered the Temple's dogma in determining the merits of Petitioner's case. Given our conclusion that the Circuit Court erred in granting the permanent injunction against Petitioner because Respondent failed to prove Petitioner's conduct would cause it irreparable harm, we find it unnecessary to reach this issue.

### *CONCLUSION*

To grant a permanent injunction, there must be evidence adduced that the party seeking the injunction will suffer irreparable harm without its issuance. In this case, Respondent failed to present evidence that it would suffer irreparable harm as a result of Petitioner's conduct. As legally ephemeral as Petitioner's claims to leadership or trusteeship of the Temple and its assets may be on this record, we can find no evidentiary support to justify the issuance of the injunction. We therefore hold that the Court of Special Appeals erred in affirming the Circuit Court's grant of permanent injunctive relief restraining Petitioner from referring to himself as an officer, director, agent, or trustee of the Moorish Science Temple of America, Inc.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF**

THE CIRCUIT COURT FOR PRINCE GEORGE'S COUN-
TY. COSTS IN THIS COURT AND THE COURT OF
SPECIAL APPEALS TO BE PAID BY RESPONDENT.