979 A.2d 260

David C. DAVIDSON

v.

SENECA CROSSING SECTION II HOMEOWNER'S
ASSOCIATION, INC., et al.

No. 527 Sept.Term, 2008.

Court of Special Appeals of Maryland.

Aug. 31, 2009.

**602**

**604**

606

608

Christine E. Sorel, Potomac, MD, for Appellant.

Jason E. Fisher (William A. Goldberg, Lerch, Early & Brewer, Chtd., on brief), Bethesda, MD, for Appellees.

Panel: DAVIS, WOODWARD, CHARLES E., MOYLAN, JR. (Retired, Specially Assigned), JJ.

WOODWARD, Judge.

Appellant, David S. Davidson, initiated this litigation by filing suit against appellees, Seneca Crossing Section II Housing Association, Inc. ("the Association"), Azadeh Kaider ("Azadeh"), Brian Kaider ("Brian"), Lourdes Sandoval ("Lourdes"), and Santiago Sandoval ("Santiago").[1] The individual appellees are past and present members of the Association's Board of

---

1. Appellant also named as defendants James Earnest, Vishawas Parekh, and Jack Zavin. None of these individuals are parties to the present appeal.

Directors. The complaint, as amended, sought declaratory, injunctive, and mandamus relief regarding the administration of the Association, as well as damages for defamation. Appellees filed a counterclaim for injunctive relief and damages for private nuisance and libel. Relief was denied on all of the parties' claims, by court rulings or jury verdict, except for appellees' counterclaim for injunctive relief. The circuit court, sitting as a court of equity, found in favor of appellees on their counterclaim and entered a permanent injunction against appellant, which proscribed certain conduct and communications by appellant regarding appellees, as is more fully set forth below. This timely appeal followed.

Appellant presents for our review a multitude of questions, which we have distilled and rephrased into three questions:[2]

---

**2.** Appellant's questions, in the words of his brief, are:

A. Was the lower Court's ruling, denying Appellant's Motion *in Limine:* Motion to Bar the Introduction of Certain Testimony and Evidence at Trial ..., on the grounds of *res judicata*, clearly erroneous as a matter of law and/or an abuse of discretion?

B. Was the lower Court's ruling, granting Appellees' prayer for a permanent injunction against Appellant clearly erroneous and/or an abuse of discretion?

1. Did the lower Court err in granting the individual Appellees *standing* to seek and obtain the permanent injunction that was granted to them against Appellant?

2. Did the lower Court err in granting relief to Appellees Azadeh Kaider and Brian Kaider when their claims for injunctive relief were moot?

2. [sic] Was the Order granting the permanent injunction clearly erroneous because it was not based upon substantial evidence?

3. Was the Order granting the permanent injunction an abuse of judicial discretion because it was not based on specific findings of irreparable harm?

C. Did the lower Court err in granting a permanent injunction that violated Appellant's constitutionally protected freedom of speech?

D. Did the lower Court make material and critical procedural and evidentiary rulings that were clearly erroneous and/or an abuse of discretion?

1. Did the lower Court err and/or abuse its discretion by admitting into evidence unauthenticated exhibits of questionable provenance?

2. Did the lower Court clearly err and/or abuse its discretion in barring, *ab initio*, all testimony concerning Appellee Santiago Sandoval's assault upon Appellant?

I. Did the trial court err or abuse its discretion in granting a permanent injunction in favor of appellees and against appellant?

II. Did the trial court's granting of a permanent injunction violate appellant's constitutional right to freedom of speech?

III. Did the trial court commit reversible error in making certain substantive and procedural rulings in the course of the litigation?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## BACKGROUND

Seneca Crossing Section II is a residential subdivision in Germantown, Montgomery County, consisting of approximately 55 homes. The Association is a corporate entity comprised of the 55 homes, each home having a voting right within the Association. The community is small, with the majority of the homes located along Summer Sweet Terrace, which is an approximately two-block-long street with a cul de sac at each end.

Appellant purchased his home in the Seneca Crossing Section II community at 20700 Summer Sweet Terrace in March of 1999. Shortly thereafter, appellant became active in the Association. As set forth more fully below, appellant's relationship with the Association deteriorated and grew hostile and antagonistic. In 2003, the Association hired a new management company, and appellant was unhappy with the services provided by that company. Appellant "complained about dues going up and services going down." Appellant also believed "that certain people on the board of directors [of the

---

3. Did the lower Court clearly err and/or abuse its discretion in granting a conditional or qualified privilege to certain written and oral communications by members of Appellee HOA's Board of Directors?

3. [sic] Did the lower Court err and/or abuse its discretion in accepting proposed jury instructions first provided by Appellees on the last day of trial?

Association] were getting preferred service." Appellant took some of his issues to the Montgomery County Commission on Common Ownership Communities and a settlement was ultimately reached.

On November 27, 2006, appellant filed a complaint against appellees and others for injunctive relief, declaratory judgment, and mandamus, regarding certain actions of the Association. On December 18, 2006, appellees filed an answer and counterclaim for injunctive relief, private nuisance, and libel of Azadeh.

At about the same time, Lourdes, Santiago, Azadeh, and Lydia Marzouk, individually, sought peace orders against appellant from the District Court of Maryland for Montgomery County. After the parties, including appellant, participated in alternative dispute resolution, a settlement was reached. On December 12, 2006, consent final peace orders were entered in favor of Lourdes, Santiago, Azadeh, and Marzouk.

Thereafter, in the instant litigation, appellant amended his complaint on several occasions. Ultimately, on September 17, 2007, appellant filed a Fifth Amended Complaint, which contained a total of six counts: (I) "breach of contract, shareholder derivative action request for declaratory relief, request for injunctive relief, request for attorney's fees," (II) defamation against Azadeh, (III) defamation against Lee Newbegin, (IV) defamation against Santiago, (V) defamation against Marzouk, and (VI) defamation against the Association. In an order dated October 22, 2007, the circuit court dismissed counts I and V of appellant's Fifth Amended Complaint. In an order entered on March 10, 2008, the circuit court dismissed count III.

Appellant's defamation claims against Azadeh, Santiago, and the Association, appellees' counterclaim for private nuisance, and libel of Azadeh were tried to a jury on March 31, 2008 to April 3, 2008. In the same proceeding, evidence was received on appellees' counterclaim for injunctive relief. At the close of appellant's case, appellees moved for judgment, which was granted in regard to counts II and IV, i.e., the defamation counts against Azadeh and Santiago. At the conclusion of the

trial, appellant moved for judgment on appellees' counterclaim for private nuisance, which was granted. The jury denied relief on all of the remaining claims, to wit, appellant's defamation against the Association and Azadeh's libel against appellant. The trial court held appellees' counterclaim for injunctive relief under advisement. Thereafter, in an order entered on May 7, 2008, the circuit court ruled in favor of appellees on their counterclaim for injunctive relief and entered a permanent injunction against appellant. This appeal followed.

Additional facts will be included as necessary for our discussion of the issues presented in this appeal.

## DISCUSSION

### I.

**Did the trial court err or abuse its discretion in granting a permanent injunction in favor of appellees and against appellant?**

#### *Standard of Review*

The relevant standard of review was articulated by the Court of Appeals in *El Bey v. Moorish Science Temple of America,* 362 Md. 339, 353, 765 A.2d 132 (2001). The Court stated:

> When reviewing a judgment arising from a bench trial, we must "review the case on both the law and the evidence" but we must not set aside the judgment of the trial court on the evidence unless clearly erroneous, for we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Additionally, we must consider the evidence in the light most favorable to the prevailing party, deciding not whether the trial judge's conclusions were correct, but whether they were supported by a preponderance of the evidence.

*Id.* (citations and quotations omitted).

■■ Where, as here, the appeal concerns the issuance of a permanent injunction, we proceed with certain principles of injunctive relief guiding our review:

> An injunction is a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience. Thus, injunctive relief is a preventative and protective remedy, *aimed at future acts,* and is not intended to redress past wrongs.

*Id.* at 353–54, 765 A.2d 132 (citations and quotations omitted) (emphasis in original).

### *Was there sufficient evidence to support the issuance of a permanent injunction?*

Appellant makes several allegations of error concerning the factual and legal basis for the trial court's issuance of a permanent injunction. We will address each argument in turn, after first setting forth the precise findings and order of the circuit court and a summary of the evidence supporting those findings.

### *The Circuit Court's Opinion and Order*

In rendering its opinion and order for injunctive relief, the trial court found:

1. [Appellant] sent unsolicited correspondence to [individual appellees] and other members of the Association that contained demeaning, harassing and gratuitously vulgar language;

2. [Appellant] made vulgar and harassing gestures to [individual appellees] and other members of the Association without cause, justification or provocation;

3. [Appellant] used obscenities, loud, antagonistic and overly boisterous tones at meetings and gatherings of the members of the Association that disrupted such meetings and interfered with the Association's ability to conduct its business affairs;

4. [Appellant's] conduct resulted in harassment of the Association's Board members and its agents including [individual appellees];

5. [Appellant's] unreasonable and outrageous conduct, verbal attacks, written words (through e-mails and letters), manner, demeanor and method of speaking has placed [individual appellees] in fear of bodily harm and that such actions constitute harassment of them;

6. [Appellant's] unreasonable and outrageous conduct (including but not limited to those actions described in Paragraphs 1–5 above), has resulted in the disruption of [individual appellees'] peaceful use and enjoyment of their respective properties and Association common areas;

7. [Appellant's] unreasonable and outrageous conduct, verbal attacks, written words (through e-mails and letters), manner, demeanor and method of speaking with [individual appellees] and other members and agents of the Association at meeting and other functions and gatherings of the Association, constituted an unreasonable disruption to the Association and resulted in interference with the Association's ability to manage its affairs, conduct peaceful and business-like meetings, transact business and tend to the affairs of the Association;

8. The acts of [appellant], set forth herein above resulted in irreparable injury under [*Coster v. Department of Personnel,* 36 Md.App. 523, 373 A.2d 1287 (1977)] and [*Harford County Education Association v. Board of Education,* 281 Md. 574, 380 A.2d 1041 (1977)], [*El Bey v. Moorish Science Temple of America,* 362 Md. 339, 355–56, 765 A.2d 132 (2001)].

Based on these findings, the circuit court, in its injunction, ordered that appellant:

1. Shall not commit or threaten to commit any act or conduct himself in any manner that harasses, causes bodily harm, threatens to cause bodily harm or places Azadeh [ ], Brian [ ], Lourdes [ ], and/or Santiago [ ] in fear of bodily harm;

2. Shall not use spoken or written words towards Azadeh [ ], Brian [ ], Lourdes [ ], Santiago [ ], and/or any member of the Association, including its Board members

(past or present) or agents, that harass[ ], tend to incite a breach of the peace or invoke a physical or violent response;

3. Shall not use spoken or written words, conduct or actions of a lewd, obscene, profane, defamatory and/or insulting manner towards Azadeh [ ], Brian [ ], Lourdes [ ], Santiago [ ], and/or any member of the Association, including its Board members (past or present) or agents, which by their very utterance harass, inflict injury or tend to incite an immediate breach of the peace;

4. Shall not verbally harass, attack or send any written communication (including but not limited to e-mails, facsimiles and/or letters) of a demeaning and harassing nature to Azadeh [ ], Brian [ ], Lourdes [ ], Santiago [ ], and/or any member of the Association, including its Board members (past or present) or agents;

5. Shall not enter the residence and/or real property of Azadeh [ ], Brian [ ], Lourdes [ ], and/or Santiago [ ];

6. Shall not initiate contact with Azadeh [ ], Brian [ ], Lourdes [ ], and/or Santiago [ ], in any manner, including but not limited to e-mails, letters, facsimiles, telephone or in person at their respective places of business, their residences or their real property. Notwithstanding the foregoing, and subject to the limitations set forth in Paragraph 7 below, in the event that one of [individual appellees] is, at the time of the intended communication, serving as a member of the Association Board of Directors or in the event the communication is one related to Association business, [appellant] may send written correspondence to that person but only by postal mail delivery, sent to care of the Association's management company;

7. Shall not communicate (verbally and/or in writing) with any member of the Association, including its Board members (past or present) or agents, using profane, intimidating, threatening, harassing, vulgar or offensive language that would tend to, by their very utterance, inflict injury and/or tend to incite an immediate breach of the peace; and

8. Shall not use obscenities, loud, antagonistic and overly boisterous tones at meetings and gatherings of the members of the Association so as to disrupt such meetings or interfere with the Association's ability to conduct its business in a business like and efficient manner; and it is

**FURTHER ORDERED,** that any breach of this Order will subject [appellant] to sanctions, damages and/or any other remedy that may be determined by this Court, or any other court of competent jurisdiction.

### The Evidence

The trial below spanned three days, with the jury rendering its verdict on a fourth day, and included the testimony of twelve individuals and substantial documentary evidence spanning the years 2003 to 2006. Taken in a light most favorable to appellees, as prevailing parties, the evidence tended to show a pattern of obscene, vulgar, belittling, and harassing communications sent from appellant to appellees; a pattern of threatening and disruptive behavior against appellees; and, actual acts, which along with the forgoing threats and behaviors, caused harm to appellees.

### Appellant's Communications

The communications entered into evidence spanned several years and included statements from appellant to various Association Board members and agents. The evidence included:

- Appellant's September 2003 email to Association Board member Marzouk stating: "You are an uneducated, ignoramus[.] Do not ever contact me via email, you ballbusting trash . . . . Do not ever contact me personally, bitch."

- Appellant's October 2003 email to the Association's email address, in which appellant addressed Marzouk:

 Your bitchy bait-and-switching attempts to obfuscate the real dispute/issue, by saying 'threatening this or threatening that' is vacuous, Bitch.

You have absolutely no self-respect. Even after you've been exposed as an empty life person.... Fuck you, bitch. See your ugly ass in court!

- Appellant's October 2003 email, copied to the Association, in which appellant stated to the then-President of the Association to "be sure to keep your leased penis extender (aka Corvette) nice and clean ... All Heil [sic] the shortshitt [sic] Napoleon."

- Appellant's September 2005 email to an attorney representing the Association calling him a "mercenary cunt[ ]" and stating: "You have a better chance of seeing jesus fucking christ, than you do of seeing me 'settle' with you cocksuckers ever again .... And I don't 'get mad.' I get litigious."

- Appellant's September 2004 email to Linda Wildman, an employee of the Association's management company, stating:

 I would remind the whole stinking lot of you azzholes [sic] that you can be replaced if it is the PROACTIVE wishes of we homeowners, disregarding the perennial bitch named Lydia Marzouk; and her sycophant, the impotent little man named Jack Zavin. And by the way, their move to illictly [sic] 'grandfather' in the IIDIOT [sic] they did for 'president'—will not stand scrutiny....

- Appellant's February 2005 email to Wildman stating: "You think this is poker bluffing, don't you? Behold what unfolds in the courts, Ms. Wildass. Have a nice day stirring your cauldron, beeee Yatch!"

- Appellant's September 2005, email to Wildman and a principal of the Association's management company, Rick Szajna, stating:

 Rickyboy—

 Read this well, buttsquirt.

Today sometime your attorney will inform you that the undersigned's attorney ... will be present at the [Association] meeting.

Your days are numbered as [the Association's] "manager," you ignorant sonofabitch. So bring your best sissy la-la 'fight,' motherfucker.

[Appellant]

- Appellant's April 2006 email to Szajna stating: "HEY RICK. YOU MFER, what do you think of me now, you henpecked, 2-inch pecker'd MFer?"

According to the testimony adduced at trial, these communications were representative of those sent by appellant to the Association's Board members and agents. Wildman testified that the Association "had received a million e-mails from [appellant] over the [year prior to September 2005]." According to her testimony, Wildman had "a file probably [a foot thick] of emails from [appellant]." The emails were "[a]lways harassing.... [T]hey never made much sense, just harassing." In the course of her testimony, Wildman reviewed the September 2004 and February 2005 emails to her from appellant, which were admitted into evidence. She then testified that the "couple of emails ... just reviewed" were "similar to the stack of emails that [she had] indicated [she had] received." Wildman further testified that the emails were copied to the Association's Board members.

Marzouk testified to receiving the October 2003 email calling her a "bitch," and testified that she had "receive[d] similar emails ... from [appellant] while [she] was on the board." Marzouk added that the Board of Directors "receive[d] copies of letters [appellant] had sent to the management company where he had referenced [Marzouk] or other board members in a similar fashion." Marzouk also testified that the emails she received from appellant "in the four-year period while [she][was] on the board," which spanned June 2000 to June 2004, were similar to the October 2003 email from appellant, in which appellant called Marzouk a "bitch."

Robert Gittens, the Association's attorney in 2005 and 2006, testified to regularly receiving emails from appellant. According to Gittens, the emails

> were very graphic. There was always very salty language involved. They were personally attacking. They only very loosely had anything to do with the litigation itself. It seemed to be a form of entertainment for [appellant].

Jack Zavin, a resident and Association Board member, testified that appellant "ha[d] personally communicated with anybody that was on the board in probably the most offensive manner I've ever seen and heard . . . in e-mails that I wouldn't want my wife or kids to see." According to Zavin, appellant had sent both emails and letters through the mail. He further testified that the contents of the emails were "rude," "include[d] four letter words," and "includ[ed] anti-Semitic remarks."

### Threats and Disruptive Behavior

There was also substantial evidence about appellant's threats and disruptive behavior in relation to the Association, its Board members, and agents.

Zavin testified to appellant's disruptive actions at Association meetings: "Since the beginning of when we were established as [the Association,] [appellant] would routinely come to the meetings and then would raise his voice. Would scream at other people and do other stuff to disrupt the meeting." Zavin testified that he could not "recall one meeting that . . . the . . . Association [had] where [appellant] wasn't destructive in some form or fashion." According to Zavin, the situation with appellant was "unmanageable." Zavin testified that at Association meetings appellant "would stand up and yell at the board members or anybody, stating that we were not doing our duty. . . . It was just a string of allegations." Zavin added, "[s]ome of us have felt threatened to the point of which we will not walk on the sidewalk in front of [appellant's] house." Zavin also testified that, in the past, appellant "ha[d]

come past in his truck while [Zavin] was walking the dog and raised his middle finger at me and screamed a whole string of obscenities and then sped up the block," and that "there ha[d] been other instances like that."

Lourdes, Santiago's wife, testified that, after becoming involved with the Association and having occasion to meet appellant, her impression of appellant was that he was "argumentative, expressing his issues quite aggressively with foul language and intimidat[ion]." According to Lourdes, appellant consistently behaved in this manner at meetings. Lourdes also testified to one occasion where appellant left a message on her home answering machine "talking about court documents or something to that effect." The message concluded with appellant "us[ing] slurs in Spanish," which "in English would be coward homosexual." Lourdes stated that she found this message "threatening," and she "felt violated." She "called the police a few days later" after receiving the message. Several days after that, Lourdes received another similar message, again using the slur "cowardly homosexual or coward homosexual." After receiving the second message, Lourdes was "very scared" and again called the police. Thereafter, Lourdes sought a peace order "to protect [her]self from being contacted again" and "to protect my family." According to Lourdes, appellant had a reputation in the community as being "[s]omebody that is feisty, scary[,] . . . [and] that insults people, [and] has an aggressive nature." As a result of appellant's behavior, Lourdes was "always nervous and live[d] in constant anxiety."

Marzouk testified that, after moving into the community in 1999, she had a very friendly relationship with appellant, his wife, and other neighbors. However, after Marzouk was elected to the Association's Board, her relationship with appellant began to change. Appellant "started to express more dissatisfaction with the board and started making more personal complaints and verbal assaults." According to Marzouk, appellant "started using a lot of profanity. His communications were very hostile. He called [the Board] by . . . bad names, derogatory [names]." Marzouk noted that appellant

"started communicating more through the management company but there were times when he got so dissatisfied and the e-mails were so nasty that [she] asked him to stop communicating with [her] personally and to please keep everything official through the management company." Appellant referred to Marzouk as "Lydia the bitch Marzouk[,] Perennial bitch, 'ho president, vacuous bitch[,] . . . lard ass[,] and a two-ton Tanya.'" According to Marzouk, appellant "indicated that he knew things about [her] husband's whereabouts that [she] never told [appellant,] . . . [and] made reference to [her] children in one of the letters that he sent around the neighborhood." This behavior from appellant caused Marzouk to be "very disgusted that [appellant] was watching [her]."

Marzouk also described appellant's behavior at Association meetings:

[Appellant] usually dominated the meeting. He was very loud, always interrupting. [The Association] tried to have, follow procedures and have some control over the meeting as far as following those procedures and having order. But [appellant] was very loud, always interrupting, always making accusations. Sometimes he'd stand up or hit the table kind of loud. I was just basically scared to say much at the meetings for fear of becoming somebody that he was going to yell at or focus on.

\* \* \*

I felt very threatened . . . like he had a lot of anger towards me. And that scared me a lot.

Marzouk further testified that this pattern of communication lasted for years and was evident in other communications received from appellant by the management company and other Board members.

Azadeh, Brian's wife, testified that she lived in the community from 1999 to 2007. Azadeh became actively involved with the Association in 2003. Azadeh testified to one event on September 22, 2003, in which appellant threatened another member of the Board of Directors:

[Appellant] approached me in a very agitated and angry manner and he made a threat to put a round between another board member's eyes.

\* \* \*

What I remember is that [appellant] came to me and he said "You tell that Williams [ (the then-president of the Association) ] that if he ever insults me again, I will place a round between his eyes. And he knows exactly what I'm talking about."

\* \* \*

[Appellant] was angry. He was red in the face. And he was stumbling over and ... I believe he was drunk.

At the time, Azadeh was with "[her] kids, [her] friend's children, and the caretaker of the kids." The event "horrified" and "terrified" Azadeh. The police were called as a result of this incident.

### Acts and Impact

Appellant's acts periodically went beyond threats and intimidation, which had a palpable effect on the Association and its members.

Wildman testified that she and Szajna attended a meeting of the Association on September 21, 2005. According to Wildman, the following transpired at that meeting:

When the President of the board at that time, Mr. Lee Newbegin went to open the meeting, [appellant] became very volatile at Mr. Newbegin and then I realized who [appellant] was. I had never met [appellant] before that time. And ... [Szajna] went to introduce himself ... because we had received a million e-mails from him over the past year at that point. . . .

\* \* \*

At that point [appellant] became, he was, his language was horrible and Mr. Newbegin told him to be quiet. [Szajna] went over and there became some very violent posturing and [Szajna] asked [appellant] if he would just [go] outside and they got up and they went outside. And

then they got into a physical confrontation and I followed them with my cell phone and other people in attendance at the meeting were asking me to call the police, which I did do.

\* \* \*

They were right up in each other's face, you know, just with their hands and then [Szajna] turned and like went to walk away and [appellant] at that time struck him.

\* \* \*

... [H]e struck him in the back....

\* \* \*

Well, [Szajna] turned around ... and he didn't strike him back.

\* \* \*

The police came and you have to understand that this is in a community center and all kinds of children were at that time at practice.... So their parents, the children and everybody else were walking by.... So the police came and they basically broke it up and took [appellant] away.[3]

According to Wildman, this event was "frightening to everybody that was in the room" and "was almost a knock down, drag out fight." Wildman stated that, "from [appellant's] past actions and his volatile e-mails and everything else it would not have surprised [her] if [appellant] ... had a gun in" the box that he brought with him to the September 21, 2005 meeting. Ultimately, appellant's behavior towards Wildman and the Association contributed to her leaving her position as property manager.

According to Zavin, appellant's behavior at the Association's meetings made the Board of Directors feel "threatened," and the Association "actually had to hire [an] off duty Montgomery County Police Officer" to be present at those meetings.

---

**3.** Both Szajna and Gittens testified to substantially the same facts regarding this event.

Lourdes summed up the impact of appellant's acts on her home life this way:

> I'm always nervous and I live in constant anxiety. I don't walk around the neighborhood at all. I used to do that once in a while. I don't do that at all. I'm terrified of going to get my mail because that means I have to get close to [appellant's] house. Every time I have to go back home I feel trapped because that means I have to get into the cul de sac I have to go through his house. It's the only entrance.... I feel scared to the point that I have avoided the local grocery stores, the local vendors, the dry cleaners, the local businesses to make sure that there's no potential encounter with him at all.
>
> * * *
>
> ... [W]e use[d] to have barbecues with the neighbors. We used to have parties for the children for Halloween and we no longer do that because you know, that creates problems, creates issues and we are always questioned about everything. We can't talk freely with neighbors.... I don't even dare to wave to anybody because when we did that once to [appellant] he was driving his truck around the cul de sac and instead of waving back he pulled down his window and gave us the finger. And he drives his motorcycles around the cul de sac and you know, squeaks the wheels and things like that. And it's intimidating and its's very uncomfortable.

Lourdes went on to note that she "was afraid this pattern [of threatening behavior by appellant] was going to continue and" she remained scared "to this day."

Marzouk testified similarly:

> I might see [appellant] on the street, but I always avoided him.
>
> * * *
>
> ... I knew about some previous incident that had happened in the neighborhood and I didn't [want] to have any interaction with him.
>
> * * *

... Basically I tried not to walk on [appellant's] side of the street. If I see him outside I directly do anything I can to avoid him, because I believe that he watches people coming and going in the neighborhood....

I always make sure to pick up my son from the bus stop or have somebody else pick up my son.... [T]he front of [appellant's] house has [a] view to the back of my house. And I always shut the windows, shut the drapes, shut the blinds so that [appellant] can't see into my personal life and space.

Marzouk also sought a peace order against appellant. Marzouk testified that she was "sick and tired of being contacted by [appellant] and being harassed by [appellant]." She "didn't want to be a part of anything more to do with [appellant,] [and] ... had informed him at least twice in print, 'Don't contact me anymore.'" Finally, Marzouk testified that, "based on [her] interactions with [appellant] over this period of time," she had "decided to leave the community even though [she] love[d] [her] home dearly."

Azadeh explained that she brought a claim of libel against appellant "based on the harassment that [she] [had] received ever since [she] got on the board and ever since [she had] been off of it until today." According to Azadeh, the Kaiders moved out of the community because of the statements and acts by appellant. Azadeh testified as to why she was seeking injunctive relief:

My family has been through a lot. My children have been through a lot. I've been through a lot. My husband has been affected by this. Not only do we want to be left alone for good, we feel that we need to be compensated for what we've been through.

\* \* \*

... I actually sought medical attention in 2003 after I got off the board. And I'm on anxiety and antidepressant medication.

Azadeh testified that appellant's harassment of her did not stop when she got off the Board and, as of the time of trial, was "still going on."

### Appellant's Contentions

■ Appellant argues that "[a]ppellees failed to meet their burden of proof: they did not present a factually and legally sufficient basis for the award of the permanent injunction." In particular, appellant first contends that the majority of the documentary evidence was "three to five years old by the time the matter came to trial" and that the "only substantive testimony . . . was that [a]ppellant was allegedly loud, boisterous, tended to yell, used profanities and obscenities, and had once given some people 'the finger.'" We disagree.

Appellees filed their counterclaim in December of 2006, and the matter came to trial, after protracted discovery and motions by each side, in March of 2008. Although the documentary evidence spanned 2003 through 2006, such evidence was not inherently stale or irrelevant to appellees' claim. To the contrary, the documentary evidence demonstrated a long, sustained, pattern of harassing communications by appellant to appellees. The testimonial evidence similarly demonstrated that appellant harbored unrelenting animosity towards the Association, its Board members, and its agents, and as a result, appellant harassed, threatened, intimidated, and insulted those involved with the Association and acted in a manner that disrupted the Association's meetings and its efforts to carry out its business. The evidence clearly evinced more than the mere loud and boisterous conduct that appellant claims. In sum, the evidence of appellant's years of harassing, threatening, intimidating, and insulting conduct directed toward the Association, its Board members, and its agents, was persuasive and substantial.

### Irreparable Harm

■ Appellant argues that the trial court erred in failing to "identify the nature of the substantial and irreparable harm

that" appellant's conduct would cause.[4]

In *Coster v. Department of Personnel,* 36 Md.App. 523, 373 A.2d 1287 (1977), we relied on American Jurisprudence's treatment of the necessity of irreparable injury for an injunction:

"A court of equity reserves its injunctive process for the protection of property or other rights against actual or threatened injuries of a substantial character which cannot be adequately remedied in a court of law. That is to say, the jurisdiction or power to grant injunctive relief should be exercised only when intervention is essential to effectually protect property or other rights, of which equity will take cognizance, against irreparable injuries. The very function of an injunction is to furnish preventive relief against irreparable mischief or injury, and the remedy will not be awarded where it appears to the satisfaction of the court that the injury complained of is not of such character. Suitors may not resort to a court of equity to restrain acts, actual or threatened, merely because they are illegal or transcend constitutional powers, unless it is apparent that

---

4. In a similar vein, appellant maintains that the trial court failed "to state specific findings of fact," and that the order "is on its face conclusory: it does not identify the nature of the substantial and irreparable harm." We disagree.

"The trial judge need not articulate each item or piece of evidence she or he has considered in reaching a decision." *John O. v. Jane O.,* 90 Md.App. 406, 429, 601 A.2d 149 (1992). "Unless it is clear that he or she did not, *we presume the trial judge knows and follows the law.* The fact that the court did not catalog each factor and all the evidence which related to each factor does not require reversal." *Id.* (citation omitted) (emphasis added). Furthermore, "[i]n reviewing a judgment of a trial court, 'the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court.' " *Bereano v. State Ethics Comm'n,* 403 Md. 716, 755 n. 10, 944 A.2d 538 (2008) (quoting *United Steelworkers of Am. AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62 (1984)).

Therefore, regardless of whether there exists a facial deficiency in the trial court's findings of fact or conclusions of law, our discussion demonstrates that there was sufficient evidence to support the trial court's judgment.

irremediable injury will result. The mere assertion that apprehended acts will inflict irreparable injury is not enough. The complaining party must allege and prove facts from which the court can reasonably infer that such would be the result."

*Id.* at 525–26, 373 A.2d 1287 (quoting 42 Am.Jur.2d *Injunctions* § 49).

We also said that

"an injury is irreparable, within the law of injunctions, where it is of such a character that a fair and reasonable redress may not be had in a court of law, so that to refuse the injunction would be a denial of justice—in other words, where, from the nature of the act, or from the circumstances surrounding the person injured, or from the financial condition of the person committing it, it cannot be readily, adequately, and completely compensated for with money."

*Id.* at 526, 373 A.2d 1287 (quoting 42 Am.Jur.2d *Injunctions* § 49).

The trial court specifically found that appellant's actions had "resulted in irreparable injury." The unambiguous implication of this finding, and the court's other findings, was that, if left unaddressed, these injuries would continue on into the future. The trial court found a sustained pattern, over three to four years, of "demeaning, harassing and gratuitously vulgar language," "vulgar and harassing gestures," "interfer[ence] with the Association's ability to conduct its business and affairs," "harassment," "unreasonable and outrageous conduct," and "verbal attacks" by appellant directed against the Association, its Board members, and its agents. Moreover, appellant's conduct, according to the trial court, "placed [the individual appellees] in fear of bodily harm" and "resulted in the disruption of [the individual appellees'] peaceful use and enjoyment of their respective properties and Association common areas." These injuries to appellees' interest in being free from harassment and threat of violence, to their interest in being able to peacefully use and enjoy their property, and to their interest in being able to contribute to the administration

of the Association, are the types of harm that cannot be compensated by a monetary award and that justify the court's issuance of injunctive relief. In sum, the trial court could reasonably infer from the evidence in the record that appellant's conduct "caused, or was likely to cause, [appellees] irreparable harm." *El Bey*, 362 Md. at 355, 765 A.2d 132.

### Other Points of Error

■ Appellant contends that "[a]warding a permanent injunction to [a]ppellees Brian [ ], Santiago [ ], and [the Association] was not supported by *any* evidence and therefore clearly erroneous, arbitrary, and an abuse of discretion." (Emphasis in original). Specifically, appellant asserts that neither Brian nor Santiago testified as to wrongful acts committed by appellant against them or against the Association, and therefore, the trial court's "decision to award the permanent injunction [to the Association, Brian, and Santiago] was *completely unsupported.*" (Emphasis in original). We disagree.

Our review of the record indicates that Brian, Santiago, and the Association did not fail to provide evidence of wrongs committed against them by appellant. Santiago testified that he was active with the Association and had served on its Board of Directors; he thus was subjected to the threats and harassment appellant directed toward the Board as a whole. This harassment was evident in Lourdes's testimony regarding the offensive answering machine message that appellant left on the Sandoval's *home* answering machine. According to Lourdes, she felt the need "to protect her family" from such threats. Lourdes's testimony as to appellant's behavior towards her family, in conjunction with the evidence of appellant's broader pattern of attacks, provided sufficient evidence of appellant's acts against Santiago, both as a member of his family, and as a member of the Association.

Similarly, Azadeh testified that she had been active with the Association and served on its Board of Directors and that Brian is her husband. Azadeh testified that appellant publicly threatened to kill another member of the Board in her pres-

ence and in the presence of her small children, which demonstrated appellant's willingness to make threats of bodily harm in front of members of Brian's family. In addition, Marzouk specifically testified that she had witnessed appellant yell at Brian, Azadeh, Lourdes, and Santiago. Therefore, the evidence indicated that Brian was in the sights of, and subject to, appellant's harassing and threatening conduct.

Also, appellant's systematic threats towards, and harassment of, the members of the Association's Board of Directors, along with appellant's disruptive behavior at Association meetings, clearly constituted wrongs against the Association. There thus was sufficient evidence to support the trial court's injunction in favor of the Association.

Nevertheless, appellant contends that Lourdes, Santiago, Azadeh, and Brian failed to testify in an "official capacity" or to "wrongs committed by [a]ppellant against the [Association] as a whole," and therefore, there was "no *factual basis at all* for awarding" an injunction on behalf of the Association. (Emphasis in original). The record does not support appellant's contention.

The Association, through its counsel, filed a counterclaim for injunctive relief against appellant, and thus the Association itself, as a corporate entity, sought an injunction. Zavin, who was at the time of the trial on the Association's Board of Directors, testified "in a representative capacity ... for the [A]ssociation as one of its board members." Zavin stated that he was "aware that [the Association was] seeking an injunction against [appellant]," and then testified as to "what the [A]ssociation [was] asking for and want[ed]." Santiago did not say that he was testifying in an official capacity, but did testify that, at the time of trial, he was president of the Association's Board of Directors. Additionally, appellant's counsel elicited testimony from Santiago that authenticated the meeting minutes created "in [his] capacity as [p]resident" of the Association.

Lourdes, Azadeh, and Brian did not, contrary to appellant's argument, need to testify in an official capacity in order to

provide a factual basis for an injunction in favor of the Association. The Association, like any party seeking an injunction, was required to put on evidence of the harm that it would suffer if the injunction was not issued. In the instant case, that evidence, in part, came in the form of testimony from these individuals, who had personal knowledge of the harassing acts and disruptive behavior that appellant exhibited toward the Association, its Board members, and agents.

■ Appellant also argues that Azadeh's and Brian's requests for injunctive relief "were moot ... [because] they had moved away from the neighborhood long before the trial." This contention fails for the simple reason that, although Azadeh and Brian had moved from Seneca Crossing Section II, they still owned their home there and thus remained members of the Association. Because the evidence showed that appellant's harassing and threatening conduct was often directed at members of the Association, especially those who attended the Association's meetings, the requests of Azadeh and Brian for injunctive relief were not moot.

■ Appellant finally argues that his own "expressed intent ... not to violate the law renders an injunction moot." This proposition, however, stands in direct opposition to our holding in *Carroll County Ethics Commission v. Lennon*, 119 Md.App. 49, 61, 703 A.2d 1338 (1998). In that case, we specifically rejected the appellant's "argument that his voluntary cessation of the challenged conduct serve[d] to moot the case," reasoning that "[i]f that were so, appellate review could consistently be foreclosed in cases like this as long as the putative violator ... simply promises to refrain from the challenged conduct." *Id.* The same reasoning applies in the instant case. Indeed, the evidence appears to be that appellant only ceased the complained of actions and behaviors upon the issuance of the peace orders and during the pendency of this litigation. Appellant's purported "disavowing" of his actions does not render appellees' claims for injunctive relief moot.

## Res Judicata

Appellant argues that "[t]he lower [c]ourt's ruling, awarding a permanent injunction against [a]ppellant to [a]ppellees Azadeh [ ], Lourdes [ ], and Santiago [ ], individually, was barred by the doctrine of *res judicata.*" Specifically, appellant contends that the peace order litigation pursued by Azadeh, Lourdes, and Santiago involved "identical" parties, claims, and facts, as well as "virtually identical relief," and resulted in final peace orders, thus barring Azadeh, Lourdes, and Santiago, under the doctrine of *res judicata,* from seeking injunctive relief in the instant case. We disagree.

██ The defense of *res judicata* is before "the court as a question of law." *Beach v. Mueller,* 32 Md.App. 219, 224 n. 3, 359 A.2d 232 (1976). "[W]e review questions of law *de novo." In re Calvin S.,* 175 Md.App. 516, 525, 930 A.2d 1099 (2007).

██ The Court of Appeals recently restated the oft cited principles of *res judicata:*

The doctrine of claim preclusion, or *res judicata,* bars the relitigation of a claim if there is a final judgment in a previous litigation where the parties, the subject matter and causes of action are identical or substantially identical as to issues actually litigated and as to those which could have or should have been raised in the previous litigation. The doctrine embodies three elements: (1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litigation.

*R & D 2001, LLC v. Rice,* 402 Md. 648, 663, 938 A.2d 839 (2008) (citations omitted). In short, *res judicata* "restrains a party from litigating the same claim repeatedly and ensures that courts do not waste time adjudicating matters which have been decided or *could have been* decided fully and fairly." *Anne Arundel County Bd. of Educ. v. Norville,* 390 Md. 93, 107, 887 A.2d 1029 (2005) (emphasis in original).

Section 3–1501 *et seq.* of the Courts and Judicial Proceedings Article ("C.J.") of Maryland Code (1973, 2006 Reply. Vol.) governs the issuance of peace orders. The statute authorizes the issuance of a peace order only upon a finding that the respondent committed certain acts against the petitioner. In particular,

A petitioner [must] ... allege[ ] the commission of any of the following acts against the petitioner by the respondent, if the act occurred within 30 days before the filing of the petition:

(1) An act that causes serious bodily harm;

(2) An act that places the petitioner in fear of imminent serious bodily harm;

(3) Assault in any degree;

(4) Rape or sexual offense under §§ 3–303 through 3–308 of the Criminal Law Article or attempted rape or sexual offense in any degree;

(5) False imprisonment;

(6) Harassment under § 3–803 of the Criminal Law Article;

(7) Stalking under § 3–802 of the Criminal Law Article;

(8) Trespass under Title 6, Subtitle 4 of the Criminal Law Article; or

(9) Malicious destruction of property under § 6–301 of the Criminal Law Article.

C.J. § 3–1503(a).

The petition is filed in the District Court following a form prescribed in C.J. § 3–1503. C.J. § 3–1505.1(a). The District Court has exclusive original jurisdiction for peace order proceedings. C.J. § 4–401(14). Whether interim, temporary, or final, a peace order offers limited forms of relief. In particular, a final peace order may include any or all of the following relief:

(i) Order the respondent to refrain from committing or threatening to commit an act specified in § 3–1503(a) of this subtitle against the petitioner;

(ii) Order the respondent to refrain from contacting, attempting to contact, or harassing the petitioner;

(iii) Order the respondent to refrain from entering the residence of the petitioner;

(iv) Order the respondent to remain away from the place of employment, school, or temporary residence of the petitioner;

(v) Direct the respondent or petitioner to participate in professionally supervised counseling or, if the parties are amenable, mediation; and

(vi) Order either party to pay filing fees and costs of a proceeding under this subtitle.

C.J. § 3–1505(d).

More importantly, "[a]ll relief granted in a final peace order shall be effective for the period stated in the order, *not to exceed 6 months.*" C.J. § 3–1505(f) (emphasis added). And, although the District Court has exclusive jurisdiction over a peace order proceeding, the statute specifically provides that "a petitioner is not limited to or precluded from pursuing any other legal remedy." C.J. § 3–1502(a).

 The circuit court's injunctive power, on the other hand, is broader than the injunctive powers held by the District Court.

Injunctive relief is an equitable remedy. Pursuant to [C.J.], § 4–402(a) . . ., "[e]xcept as provided in § § 4–401 and 4–404 of [subtitle 4, Civil Jurisdiction], the District Court does not have equity jurisdiction." Section § 4–401 lists matters over which the District Court has exclusive original jurisdiction. Pursuant to that section, injunctive relief, except with respect to landlord/tenant disputes[,] [peace orders,[5]] and certain other property matters, is not a remedy within the province of the District Court. Section 4–404 provides the District Court with concurrent jurisdiction over matters involving domestic violence. Thus, . . .

---

5. *See* C.J. § 4–401(14).

the District Court does not have general equity jurisdiction. . . .

*Worsham v. Ehrlich,* 181 Md.App. 711, 724–25, 957 A.2d 161, cert. denied, 406 Md. 747, 962 A.2d 373 (2008) (second and third brackets in original). Maryland Rule 15–502(b) provides that "at any stage of an action and at the instance of any party or on [the circuit court's] own initiative, [the court] may grant an injunction *upon the terms and conditions justice may require.*" (Emphasis added). Unlike a peace order, then, an injunction is not predicated upon a particular statutory scheme or enumerated forms of relief, and, notably, an injunction is not subject to a six month limitation.

In the instant case, on December 9, 2006, Azadeh, Lourdes, and Santiago filed petitions seeking to restrain appellant from, among other things, contacting, harassing, or going to the residence of those appellees. Consistent with the peace order statute, these appellees, in their petitions, complained of harassing and threatening behavior by appellant and provided narrative accounts of that harassment. Interim peace orders were issued by a commissioner of the District Court of Maryland for Montgomery County. Thereafter, on December 12, 2006, final peace orders were issued, and consistent with the statute, each order lasted for only six months, *i.e.,* they stayed in effect "until 6/11/2007."

■■■ Despite the similarities between the peace order proceedings and the injunctive relief sought in the instant case, the two actions are fundamentally dissimilar. First, appellees could not set forth in their peace order petitions any acts committed by appellant more than 30 days prior to the filing of the petitions, nor could they obtain a peace order for appellant's conduct that did not constitute the acts specified in C.J. 3–1503(a)(1)–(9). Although these acts include harassment and acts placing the petitioner in fear of imminent serious bodily harm, they do not include interference with the use and enjoyment of real property, disruption of the Association's meetings, and other circumstances that laid the foundation for appellees' request for permanent injunctive relief. Thus all of

the claims that were brought for injunctive relief in the case *sub judice* could not have been brought in the peace order proceeding. Second, the relief granted to these appellees in the peace orders was not, and could not have been, the same relief that the permanent injunction afforded appellees. On its face, a peace order action is limited to those enumerated forms of relief in C.J. § 3–1505(d), and is limited in duration to a mere six months. Appellees could not seek the expansive, and precisely-tailored, relief that the circuit court was able to craft in the instant case.

Because the claims and relief in the two proceedings were not and could not be identical, the peace order proceeding in the instant case did not have the effect of barring, under the doctrine of *res judicata*, appellees' action in the circuit court for injunctive relief.

Finally, C.J. § 3–1502(a) explicitly provides that a petitioner is "not limited to or precluded from pursuing any other legal remedy." The plain language of the statute supports our interpretation that the issuance of peace orders to Azadeh, Lourdes, and Santiago did not have a preclusive effect on their ability to seek permanent injunctive relief in the instant case. *See Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001) (noting that the plain language of a statute is the best evidence of legislative intent). If we were to conclude that the peace order statute precluded permanent injunctive relief, we would render this provision superfluous and a nullity; this we are cannot do. *See Handley v. Ocean Downs, LLC,* 151 Md.App. 615, 637, 827 A.2d 961 (2003) ("If our interpretation were otherwise, the legislative reservation of all 'other available remedies' would be a nullity, and the statutory language would be superfluous."). Had the legislature intended to preclude those seeking peace orders from also seeking injunctive relief, or *vice versa,* the legislature could have done so. *See* Md.Code (1984, 2006 Repl. Vol.), Family Law Article § 4–510(b) (providing that "[a] person eligible for relief [under the domestic violence protective order statute] ... is not eligible for peace order relief under" C.J. § 3–1501 *et seq.*).

In sum, Azadeh, Lourdes, and Santiago were not barred by the doctrine of *res judicata* from seeking and obtaining permanent injunctive relief in the instant action because of the issuance of final peace orders by the District Court in their favor and against appellant.

## II.

### Did the trial court's granting of a permanent injunction violate appellant's constitutional right to freedom of speech?

Appellant argues that the "permanent injunction ..., on its face, constitutes an impermissible infringement upon [a]ppellant's constitutionally protected freedom of speech." [6] We disagree.

The answer to appellant's question concerns two veins of constitutional law: injunctions that impinge upon protected speech, and fighting words that constitute unprotected speech. "Injunctions ... are remedies imposed for violations (or threatened violations) of a legislative or judicial decree," and thus "carry greater risks of censorship and discriminatory application." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). "Injunctions," however, "have some advantages ... in that they can be tailored by a trial judge to afford more precise relief than a statute where a violation of the law has already occurred." *Id.* In evaluating an injunction, "a somewhat more stringent application of general First Amendment principles" is necessary. *Id.* at 765, 114 S.Ct. 2516. Consequently, "[w]e must ask ... whether the challenged provisions of the

---

6. Appellant also contends that the injunction amounts to retaliation by public officials. The Association, however, is not a public entity and its Board members are not public officials, and therefore, neither is subject to the constitutional limitations placed upon public entities and public officials. *See Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n*, 192 N.J. 344, 929 A.2d 1060, 1074 (2007) (holding that the homeowners' association was not subject to the full array of constitutional limitations including protection of free speech).

injunction burden no more speech than necessary to serve a significant government interest." *Id.* If no protected speech is burdened, then the First Amendment is not implicated, and we need not divine a significant government interest.

"The doctrine of 'fighting' words was originated by the Supreme Court in 1942 in *Chaplinsky v. New Hampshire*[, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)]." *Downs v. State,* 278 Md. 610, 613, 366 A.2d 41 (1976), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). The Supreme Court, in *Chaplinsky,* stated:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

315 U.S. at 571–72, 62 S.Ct. 766 (footnotes omitted).

"Although *Chaplinsky* makes it clear that 'fighting' words are outside of the protection of the Constitution, ... 'fighting' words have been recognized as having some social value and are punishable ... only when there is a likelihood of imminent disturbance." *Downs,* 278 Md. at 614–15, 366 A.2d 41. Consequently, although the doctrine of fighting words has been limited and refined over the years, the definition of fighting words remains in the law as those utterances that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." *Dziekonski v. State,* 127 Md.App. 191, 203, 732 A.2d 367 (1999) (internal quotations omitted). Thus "the State is free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called 'fighting words', those personally abusive epithets which, when ad-

dressed to an ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Id.* at 202, 732 A.2d 367. "[E]mphasis is to be placed upon the context in which the words are uttered as opposed to the words themselves." *Id.* at 204, 732 A.2d 367.

In the instant case, we begin our analysis by identifying those elements of the trial court's injunction that *could* impinge on appellant's free speech right. Those elements that regulate conduct, and not speech, are not subject to analysis and scrutiny, where, as here, appellant only raises as an issue his right to free speech. The first paragraph of the injunction prohibits appellant from committing or threatening to commit "any act . . . that harasses, causes bodily harm, threatens to cause bodily harm or places [certain appellees] in fear of bodily harm." This paragraph prohibits conduct, not speech, and therefore is not subject to our review. Paragraph 5 prohibits appellant from entering onto certain property, and paragraph 8 prohibits certain disruptive behavior by appellant at the Association's meetings; thus both of these restraints concern appellant's conduct and not his speech.

The remaining paragraphs of the injunction touch upon appellant's free speech rights. The majority of the paragraphs, however, rely on substantially the same qualifying language in enunciating the prohibitions placed on appellant. Paragraph 2 prohibits appellant from "us[ing] spoken or written words towards Azadeh [ ], Brian [ ], Lourdes [ ], and/or Santiago [ ] and/or any member of the Association, including its Board members (past or present) or agents, that *harass[ ], tend to incite a breach of the peace or invoke a physical violent response.*" (Emphasis added). Paragraph 3 prohibits "words, conduct or actions of a lewd, obscene, profane, defamatory and/or insulting manner . . . *which by their very utterance harass, inflict injury or tend to incite an immediate breach of the peace.*" (Emphasis added). Paragraph 7 contains almost identical language. Paragraph 4 prohibits appellant from verbally harassing, attacking, or sending communications of a "demeaning and harassing nature" to Azadeh,

Brian, Lourdes, Santiago, and/or any member of the Association.

Paragraph 6, unlike the other paragraphs, prohibits appellant from "initiat[ing] contact with Azadeh [ ], Brian [ ], Lourdes [ ] and/or Santiago [ ] in any manner," except that "in the event the communication is one related to Association business, [appellant] may send written correspondence to that person but only by postal mail delivery, sent to care of the Association's management company."

In formulating the injunction, the trial court specifically stated that it was based on the evidence and testimony of "the actions of [appellant] . . . which have disrupted generally the peace, safety, good order and general welfare of [appellees]." As discussed above, the facts found by the trial court, which are well-supported by the evidence, showed that appellant engaged in a sustained pattern of "demeaning, harassing and gratuitously vulgar language," "vulgar and harassing gestures," "interfer[ence] with the Association's ability to conduct its business affairs," "harassment," "unreasonable and outrageous conduct," and "verbal attacks" by appellant directed against the Association, its Board members, and its agents. It is clear from the record and the findings of fact that much of appellant's behavior consisted of the use of "fighting words." Without repeating the language used by appellant against appellees, we conclude that appellant regularly employed "personally abusive epithets which . . . [were] . . . inherently likely to provoke violent reaction." *Dziekonski*, 127 Md.App. at 202, 732 A.2d 367 (internal quotations omitted).

It was just such "fighting words" that the circuit court sought to prohibit in fashioning the injunction in the manner that it did. The circuit court tailored the injunction to prohibit appellant, in specific circumstances and with regard to certain individuals or classes of persons, from using "words . . . that . . . tend to incite a breach of the peace or invoke a physical or violent response." In fact, all of the prohibitions crafted by the circuit court were intended to reduce the threat of "imminent disturbance," *Downs*, 278 Md. at 615, 366 A.2d

41, which had so frequently occurred in the course of appellant's interactions with appellees over the course of several years. We conclude that the circuit court narrowly tailored the injunction to prohibit appellant's use of fighting words and that the injunction goes no further in impinging on appellant's right to free speech. Thus, because fighting words are unprotected speech, the circuit court was permitted "to ban the simple use, without demonstration of additional justifying circumstances," *Dziekonski*, 127 Md.App. at 202, 732 A.2d 367 (internal quotations omitted), of the fighting words in the manner set forth in the permanent injunction against appellant. The trial court did not violate appellant's constitutional right to free speech.

## III.

### Did the trial court commit reversible error in making certain substantive and procedural rulings in the course of the litigation?

#### *Certain Documents Deemed Admitted*

Appellant argues that the court "abused its discretion in admitting into evidence unauthenticated exhibits of questionable provenance." The exhibits at issue were copies of certain emails sent by appellant. Appellees served a Request for Admissions on appellant, which included a request for admission of the authenticity of the emails at issue. Appellant's response to many of the requests, particularly those going to authenticity of the emails, was a general objection. When appellant filed amended responses to appellees' Request for Admissions, appellees filed a motion to strike the amended responses. In its opinion, the trial court, noting that "relevance in discovery is very liberal," overruled appellant's objections. The trial court then deemed admitted many of the requests, including those concerning the authenticity of the emails, because they were "denied in bad faith or with insufficient reason."

"[A]s established by the permissive language throughout Rule 2–424, the court has a great deal of discretion in deciding how to handle the situation when an untimely or insufficient response to a request for admission is filed." *Gonzales v. Boas,* 162 Md.App. 344, 357, 874 A.2d 491 (2005). On appeal, where we conclude that "a trial court's ruling is reasonable, even if we believe it might have gone the other way, we will not disturb it." *Id.*

In the instant case, appellant has failed to articulate how the trial court's decision was unreasonable. Appellant appears to argue that the trial court should have allowed appellant to amend his responses to appellees' Request for Admissions and that, by ruling that the emails had been admitted by appellant, the court admitted "documents that were unauthenticated, redacted, untimely, and lacking in foundation." Our review of the record supports the trial court's determination that appellant's responses, which appellant admits were "not entirely forthcoming," were in bad faith or without sufficient reason, and thus the trial court did not abuse its discretion in ruling appellees' requests to have been admitted by appellant.

### Testimony Concerning an Assault

Appellant argues that the trial court "abused its discretion in barring, *ab initio,* all testimony concerning [Santiago's] unprovoked assault upon Appellant at the courthouse." Our review proceeds from the principle that "[t]he admission of evidence is committed to the sound discretion of the trial court and will not be reversed unless there is a clear abuse of discretion." *Thomas v. State,* 397 Md. 557, 579, 919 A.2d 49 (2007). We "will only reverse upon finding that the trial judge's determination was both manifestly wrong and substantially injurious." *Lomax v. Comptroller of Treasury,* 88 Md. App. 50, 54, 591 A.2d 1311 (1991) (citations omitted).

During the course of the trial, appellant and Santiago got into a physical altercation in the hallway of the courthouse. When the issue was raised before the trial court, appellant's counsel unequivocally stated: "I agree absolutely that sub-

stantively [evidence about the altercation] has nothing to do with anything that's being litigated here today." Thereafter, however, appellant argued to the trial court that, "for the purposes of defining what [Santiago] understands the word [criminality] to mean," evidence of the altercation was relevant. The trial court excluded evidence of the altercation. Appellant argues in this Court that, by prohibiting evidence of the altercation, the trial court "depriv[ed] [a]ppellant of a valuable impeaching tool, to his extreme prejudice." We disagree.

There was nothing manifestly wrong or prejudicial about the trial court choosing to exclude evidence of a collateral matter—a matter that occurred after, and without relation to, any of the acts that gave rise to the litigation between appellant and appellees—when such evidence was to be used only for the purpose of impeachment. Therefore, the trial court did not abuse its discretion in prohibiting at the trial evidence of the courthouse altercation between appellant and Santiago.

### *A Conditional Privilege*

Appellant complains that the trial court "abused its discretion in granting a conditional or qualified privilege to certain written and oral communication by members of [the Association's] Board of Directors." The ruling appellant complains of appears to be the trial court's ruling that "the evidence contained in the [June 27, 2006 Association meeting] minutes ... carry with them a conditional privilege[,] ... [b]ecause this was a board meeting to determine ... who was to be elected among which one of the candidates was [appellant]."

 We have previously set forth the relevant law concerning conditional privileges in a defamation setting:

Conditional or qualified privileges in defamation law evolved in a similar manner to that of an absolute privilege, as a means of weighing an important societal interest against the interest of an individual to vindicate injury to his reputation. Conditional privileges rest upon the notion that

a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest. For instance, a conditional privilege exists when the occasion shows that the communicating party and the recipient have a mutual interest in the subject matter, or some duty with respect thereto.

The existence of a conditional privilege is a question of law for the judge, and the burden of proof is upon the defendant. A conditional privilege may be lost, however, if the plaintiff can prove the defamatory publication was made for a purpose other than furthering the applicable societal interest, or that the publisher made the statement with malice. Once a judge determines that a privilege exists, the question of whether the privilege was abused is for the jury, subject to the censorial power of the judge where there is no evidence of malice, and the burden on the issue is on the plaintiff.

*Woodruff v. Trepel,* 125 Md.App. 381, 401–02, 725 A.2d 612 (citations and quotations omitted), *cert. denied,* 354 Md. 332, 731 A.2d 440 (1999). "The idea is to promote free exchange of relevant information among those engaged in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit." *Gohari v. Darvish,* 363 Md. 42, 58, 767 A.2d 321 (2001) (internal quotation omitted).

 The June 27, 2006 meeting minutes recount a meeting of the Association to elect its Board of Directors. The minutes state that ballots were distributed, candidates were introduced, and an election was carried out. There is also reference to the fact that "[s]everal residents expressed concern regarding the nomination of [appellant], noting that at the last meeting, he physically assaulted someone and was banned from the building, and in the past has threatened residents and other Board members."

It is self-evident that all those in attendance were members of the Association who shared the common interest of electing

a qualified and competent Board of Directors. The statements by the members, and the minutes recording the same, were made in the interest of having a frank discussion about who should serve on the Association's Board. Such a discussion is consistent with the goals of the qualified privilege, which include promoting the free exchange of ideas. In our view, although appellant's reputational interest may have been affected by the statements, society's interest in allowing a candid discussion in such circumstances is superior. Furthermore, we see no evidence that the statements were made or recorded with malice. We conclude, therefore, that the statements made at the meeting, and the minutes thereof, fit squarely within the qualified privilege, and the trial court did not err in so holding.

### *Jury Instructions*

Appellant's last point of error is that "[t]he lower [c]ourt abused its discretion in accepting proposed jury instructions first provided by [a]ppellees on the last day of trial[,]" because "[a]ppellant had no meaningful opportunity to research and evaluate the proposed instructions, or to oppose them in a substantive way." In support of this argument, appellant offers neither factual support nor legal authority. In so doing, appellant violated Maryland Rules 8–504(a)(4) & (a)(5). *See* Md. Rule 8–504(a)(4) (stating that a brief shall include "[a] clear concise statement of the facts material to a determination of the questions presented" and shall make reference "to the pages of the record extract supporting the assertions."); *Rollins v. Capital Plaza Associates, L.P.,* 181 Md.App. 188, 201, 955 A.2d 869 (stating that the appellant violated "Rule 8–504(a)(5) by failing to provide any legal authority for her contentions."), *cert. denied,* 406 Md. 746, 962 A.2d 372 (2008). Where a party raises an issue on appeal, but fails to provide a proper supporting argument, which includes citation to legal authority and to material facts in the record, this Court, in the exercise of its discretion, may decline to consider the merits of the question so presented. *See Beck v.*

*Mangels,* 100 Md.App. 144, 149, 640 A.2d 236 (1994). We elect to do so here.[7]

**JUDGMENT OF THE CIRCUIT COURT FOR MONT- GOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

7. Moreover, in reviewing the trial judge's giving of instructions, "the standard for reversible error places the burden on the complaining party to show both prejudice and error." *Farley v. Allstate Ins. Co.,* 355 Md. 34, 47, 733 A.2d 1014 (1999).